**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ORACLE CORPORATION, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) **<u>COMPLAINT</u>** |
| | ) |
| CHARTIS SPECIALTY INSURANCE COMPANY, | ) **<u>JURY TRIAL DEMANDED</u>** |
| | ) |
| | ) |
| Defendant. | ) |
| | ) |

Plaintiff Oracle Corporation ("Oracle"), by and through its undersigned counsel, for its

Complaint against Defendant Chartis Specialty Insurance Company ("AIG"), alleges as follows:

<u>**PRELIMINARY STATEMENT**</u>

1.      This is an action for declaratory relief and damages for breach of contract, arising

out of AIG's breach of its obligations under an excess "follow-form" technology errors and

omissions insurance policy sold to Oracle by AIG.

2.      In direct violation of its contractual obligations to Oracle, AIG has neither

advanced nor reimbursed Oracle for its litigation and settlement costs in connection with various

lawsuits arising from Oracle's work performed for the State of Oregon between 2010 and 2014

in connection with (1) Oregon's healthcare insurance exchange run by the Oregon Health

Insurance Exchange Corporation[1] (the "Cover Oregon Project"), and (2) a related project to

modernize Oregon's health and human services IT systems (the "Modernization Project").

Those lawsuits include:

---

[1] The Oregon Health Insurance Exchange Corporation (d/b/a Cover Oregon) was a public corporation created
by the Oregon legislature to run the State's healthcare insurance exchange.

a.   *Oracle America, Inc. v. Oregon Health Insurance Exchange Corp., et al.*, Case No. 3:14-cv-1279 (D. Or.), filed in August 2014, along with cross-appeals to the Ninth Circuit filed in December 2015 under the caption *Oracle America, Inc. v. State of Oregon*, Case Nos. 15-cv-35950 and 15-cv-35975 (together, the "Federal Action");

b.   *Rosenblum, et al. v. Oracle America, Inc., et al.*, Case No. 14 CV 20043 (Or. Cir. Ct., Marion Cnty.), filed in August 2014 (the "State Action");

c.   *State of Oregon v. Oracle America, Inc., et al.*, Case No. 15 CV 03287 (Or. Cir. Ct., Marion Cnty.), filed in February 2015 (the "Injunction Lawsuit");

d.   *Oracle America, Inc. v. Kevin Looper, et al.*, Case No. 15-cv-04705 (Or. Cir. Ct., Multnomah Cnty.), filed in February 2015 (the "Looper Lawsuit");

e.   *Oracle America, Inc. v. Governor Kate Brown*, Case. No. 15 CV 30762 (Or. Cir. Ct., Marion Cnty.), filed in November 2015 (the "Public Records Lawsuit");

f.   *Oracle America, Inc. v. State of Oregon, by and through Governor Kate Brown, et al.*, Case No. 16 CV 01760 (Or. Cir. Ct., Marion Cnty.), filed in January 2016 (the "Settlement Lawsuit");

g.   *Oracle America, Inc. v. Sylvia Mathews Burwell*, Case No. 1:16-cv-00451-RJL (D.D.C.), filed in March 2016 (the "Writ of Mandamus Lawsuit");

(The above-referenced lawsuits, together with any related actions, writs and appeals, are referred to herein collectively as the "Cover Oregon Lawsuits").

3.   The Cover Oregon Lawsuits arose in connection with Oracle's overarching defense to claims that the State of Oregon and Cover Oregon initially threatened and then formally brought, seeking billions of dollars in damages from Oracle arising from its provision of software, consulting and other services to Oregon in connection with the Cover Oregon and Modernization Projects (the "Cover Oregon Claim").

4.   Oracle provided prompt notice of the Cover Oregon Claim to its insurers, and Oracle's primary insurer tendered its full coverage limit to Oracle in connection with the Cover

Oregon Claim.  But when Oracle sought its unreimbursed defense and indemnity costs from AIG – whose first-layer excess policy follows the form of the primary policy, and thus is subject to the same terms, conditions and exclusions of that policy – AIG refused to pay its coverage limit to reimburse those costs.

5.       Throughout the pendency of the Cover Oregon Lawsuits, Oracle kept AIG regularly informed of all developments, including the defense counsel retained, the total costs incurred, and the details relating to the ultimate settlement of the State Action (the "Settlement"), and the simultaneous resolution of all Lawsuits in connection with the Cover Oregon Claim. Nevertheless, AIG refused to pay its coverage limit.

6.       At no point during the life of the Cover Oregon Claim or the pendency of these Lawsuits, up to and including the point of Settlement, did AIG ever object to Oracle's choice of defense counsel or any legal or settlement costs incurred in connection therewith.

7.       Instead, AIG sat on its hands for more than three years from when Oracle first tendered notice of the Cover Oregon dispute in 2014, and for nearly six months *after* Oracle requested specific reimbursement from AIG, before it denied any obligation to Oracle and refused to pay.

8.       Notwithstanding Oracle's satisfaction of the self-insured retention and its primary insurer having tendered its full coverage limit to Oracle for the Cover Oregon Claim, AIG refused to pay any monies to Oracle for the first time in July 2017, in contravention of its coverage obligations.

9.       Oracle's litigation and Settlement costs for all the Cover Oregon Lawsuits are covered under AIG's follow-form excess insurance Policy No. 01-842-68-53 issued to Oracle

(the "AIG Excess Policy"), and AIG was obliged to pay 100% of its policy limit toward Oracle's covered loss in excess of the underlying primary insurance limit, which has been fully exhausted.

10.     As AIG has refused to pay these covered amounts, raising various inapplicable defenses to coverage in breach of its obligations under the AIG Excess Policy, Oracle has been forced to bring this action to obtain the coverage under the AIG Excess Policy it purchased.

## PARTIES

11.     Plaintiff Oracle is a Delaware corporation with its principal place of business in California.  Oracle is a technology company that supplies software, hardware, consulting services, and cloud services.

12.     Defendant AIG is an Illinois corporation with its principal place of business in New York, New York.  At all material times, on information and belief, AIG has conducted substantial business within the State of New York, including engaging in the business of selling insurance, investigating claims, and/or issuing policies that cover policyholders or activities located in New York.

## JURISDICTION AND VENUE

13.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  This action is between citizens of different States, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

14.     Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

## FACTUAL BACKGROUND

### A.     THE INSURANCE POLICIES

15.     In consideration of the payment of substantial premiums to cover precisely the type of claims at issue here, Certain Underwriters at Lloyd's, Syndicates 623 and 2623,

subscribing to Policy No. QF009013 ("Beazley"), and AIG, respectively, sold Oracle claims-made coverage insuring Oracle for claims brought against Insureds during the Policy Period from March 31, 2013 to March 31, 2014, or for claims based on allegations that are the same as or related to claims made during that period.  A copy of the primary Beazley Policy No. B0509QF009013 (the "Primary Policy"), is attached hereto as <u>Exhibit A</u>.

16.     The Primary Policy identifies Oracle as the "Named Insured" and extends coverage to any "Insureds," defined to include any subsidiaries of the Named Insured, including Oracle America, Inc., as well as any directors, officers and employees of Oracle.

17.     The AIG Excess Policy provides the first layer of excess coverage to Oracle, in excess of the Primary Policy limits of liability and a self-insured retention.  A copy of the AIG Excess Policy is attached hereto as <u>Exhibit B</u>.

18.     The AIG Excess Policy "follows form" to the Primary Policy, meaning that, aside from attachment points and limits of liability (and unless otherwise specified), the AIG Excess Policy incorporates and adopts the terms, conditions, definitions and exclusions of the Primary Policy, including those discussed immediately below.

19.     The Primary Policy provides coverage for "**Damages** and **Claims Expenses**" in excess of the deductible, which:

> the **Insured** shall become legally obligated to pay because of any **Claim** . . . arising out of any negligent act, error or omission, misstatement or misleading statement or any unintentional breach of contract, in rendering or failure to render **Professional Services** or **Technology Based Services** . . . by the **Insured** or by any person or entity, including an independent contractor, for whose negligent act, error or omission, misstatement or misleading statement or unintentional breach of contract the **Insured Organization** is legally responsible.

20.     The Primary Policy also covers "**Damages** and **Claims Expenses**" arising out of:

> (1) any negligent act, error or omission, or any unintentional

breach of contract, by the Insured . . . that results in the failure
of **Technology Products** to perform the function or serve the
purpose intended . . . .

21.     "**Claim**" is defined in the Primary Policy to include all of the following:

(1) a written demand received by any **Insured** for money or
services, including the service of suit or institution of
arbitration proceedings;

(2) a written threat or initiation of a suit against any **Insured**
seeking injunctive relief (meaning a temporary restraining
order or a preliminary or permanent injunction);

. . .

(4) a written request or agreement to toll or waive a statute of
limitations relating to a potential **Claim** described above.

22.     The Primary Policy also broadly defines covered "**Claims Expenses**" to include

not only all "reasonable and necessary fees charged by an attorney designated in accordance with

Clause II.A," but additionally:

all other fees, costs and expenses resulting from the investigation,
adjustment, defense and appeal of a **Claim,** suit or proceeding
arising in connection therewith, or circumstance which might
lead to a **Claim**, if incurred by the Underwriters, or by the
**Insured** in accordance with Clause II.A.

23.     Clause II.A provides that "[t]he Named Insured shall have the right to select

defense counsel."  Its second paragraph governs advancement of Claims Expenses, and provides

that, subject to allocation, the insurer "shall advance, on behalf of the **Insureds**, **Claims**

**Expenses** which the **Insureds** have incurred prior to the final disposition of such **Claim** . . . ."

24.     "**Damages**" is defined to include "a monetary judgment, award or settlement,"

though excludes:

matters deemed uninsurable under the law pursuant to which this
Policy shall be construed; provided that for purposes of this
provision, the law most favorable to insurability shall be applied.

25.    For purposes of applying this exception to Damages, however:

the most favorable law of the following applicable jurisdictions shall be applied: (a) where the **Claim** is made or brought; (b) where the **Insured Organization** is incorporated or has its principal place of business; (c) where the natural person **Insured** liable for such damages resides (if applicable); and (d) where the Underwriters are incorporated or have their principal place of business.

26.    In addition to the choice of law provision governing the exception to Damages, disputes involving the Primary Policy shall be resolved pursuant to California law.

27.    With respect to allocation of Damages and Claims Expenses, Clause II.B of the Primary Policy provides that:

If **Damages** and/or **Claims Expenses** covered by this Policy are incurred along with costs, expenses and losses not covered by this Policy, then the **Insured** and the Underwriters agree to allocate such amount between covered **Damages** and/or **Claims Expenses** and any non-covered costs, expenses or losses based upon the relative legal exposures and the relative benefits obtained by the parties . . . .

## B.    THE UNDERLYING COVER OREGON CLAIM & LAWSUITS

28.    Upon information and belief, in early 2009, the State of Oregon began investigating software options for a project by which it would modernize its delivery of certain social services programs.  Upon passage of the Patient Protection and Affordable Care Act ("ACA") in March 2010, Oregon added a health insurance exchange to the project it was then contemplating.

29.    The State of Oregon thereafter hired Oracle to assist the State in implementing the software solutions for both the Modernization and Cover Oregon Projects.

30.    Upon information and belief, the two Projects encountered political and technical problems giving rise to a dispute between the parties.  By the end of February 2014, while the Oracle system was ready for public release, the State chose not to launch the public website, and

at the end of April 2014, announced its decision to abandon the Oracle technology and switch over to the federal health insurance exchange.

31.     Even prior to the State's ultimate decision to abandon the Oracle system, starting in August 2013, the parties faced a disagreement over invoices.  That disagreement led to the execution of a Tolling Agreement on or about February 28, 2014 among Oracle, Cover Oregon, and the State of Oregon, pursuant to which Cover Oregon agreed to pay a portion of Oracle's fees owed for past work and to pay monthly for requested work going forward.  Oracle continued work under this arrangement until mid-June of 2014.

32.     Notwithstanding this agreement, however, the dispute intensified and in a May 29, 2014 speech to a legislative committee, then-Oregon Governor John Kitzhaber announced that he had asked the Oregon Attorney General to sue Oracle to recover the funds paid for the Cover Oregon Project.  The next day, on May 30, 2014, the Oregon Attorney General reported in writing that she was investigating the facts and developing legal strategies to carry out the Governor's directive to sue.

33.     As part of this effort, in June 2014, Oregon issued Civil Investigative Demands to Oracle seeking a broad production of documents.

34.     Despite these Demands, in July 2014, Oracle made yet another attempt at resolution.  Oracle received no response to its proposal and Oregon's lawyers instead announced that the State would seek to recover in excess of $1 billion from Oracle.

35.     As a direct result of this announcement, and in defense against Cover Oregon's threatened claim, on or about August 8, 2014, Oracle preemptively initiated the Federal Action against Cover Oregon for breach of contract based on the failure to pay outstanding invoices.

Oracle thereafter amended its complaint to assert copyright infringement claims based on Cover Oregon's and the State's use of and preparation of derivative works from Oracle's software.

36.     Days later, the Attorney General of Oregon followed through on the Governor's directive to sue Oracle by filing the State Action against several defendants, including Oracle subsidiary Oracle America, Inc. and six Oracle employees.  The State Action, filed on or about August 22, 2014, sought billions of dollars in damages, plus prejudgment interest and statutory penalties.

37.     In February 2015, Oregon also filed the Injunction Lawsuit in Oregon state court seeking to force Oracle to continue providing hosting services beyond the contract term, at a time that the State was alleging in the State Action that Oracle's hosting services were inadequate.

38.     In order to properly defend itself and in order to build Oracle's overall defense to the Cover Oregon Claim, Oracle took the following steps:

a.     In February 2015, Oracle filed the Looper Lawsuit against the former Governor's political advisors who had been involved with, and who had consulted on, the decision to abandon the Oracle system;

b.     In November 2015, Oracle filed the Public Records Lawsuit to secure production of relevant documents regarding the State's handling of and political cover-up regarding the Cover Oregon Project;

c.     In January 2016, Oracle filed the Settlement Lawsuit in Oregon state court to enforce an oral agreement that Oracle had reached with the Governor's office respecting the Cover Oregon Claim;

d.     In February 2016, Oracle responded to requests for documents and information from the House Oversight and Government Reform Committee, providing information on issues in the Looper Lawsuit regarding the State's abandonment of the Oracle system for political reasons; and

e.     In March 2016, Oracle filed the Writ of Mandamus Lawsuit seeking dismissal of Oregon's claims in the State Action on the ground that only the federal government had standing to sue because Oregon paid Oracle solely from federal funds.

39.     All the Cover Oregon Lawsuits involved the same core of operative facts and arose because of the same basic Cover Oregon Claim dispute.  Indeed, after the State Action settled on or about September 15, 2016, including a monetary component of $35 million, all the Cover Oregon Lawsuits were simultaneously resolved, in full resolution of the dispute between the parties.

40.     As part of Oracle's overarching defense to the Cover Oregon Claim and Lawsuits arising therefrom, it retained various law firms and consultants.

41.     Despite having received proper notice, at no point in time during the life of the Cover Oregon Claim and pendency of these Lawsuits did AIG ever object to Oracle's retention of defense counsel or to the costs Oracle incurred in connection therewith.

## C.     ORACLE KEEPS ALL INSURERS APPRISED REGARDING THE COVER OREGON CLAIM & LAWSUITS

42.     Beginning in 2014, Oracle provided notice to AIG of the initial Cover Oregon dispute and provided regular updates regarding the various Cover Oregon Lawsuits that arose in connection therewith during the pendency of those Lawsuits.

43.     On or around March 28, 2014, in light of the ongoing dispute, Oracle first reported a notice of circumstance to all of Oracle's 2013-2014 insurers (the "E&O Insurers"), including AIG, informing them of the potential claims arising from Oracle's provision of software, consulting and other services to the State of Oregon for the Cover Oregon and Modernization Projects.  This notice specifically informed AIG that Cover Oregon threatened to seek recovery of sums paid, that the parties signed an agreement tolling any statute of limitations applicable to the dispute in February 2014, and that defense counsel had been retained.  In June 2014, Oracle supplemented that notice to inform the E&O Insurers of the then-Governor's speech and the Attorney General's written threat to sue Oracle.

44.     Subsequent to these initial notices, from 2014-onward, Oracle timely informed AIG regarding each and every Cover Oregon Lawsuit, identifying counsel who would represent Oracle in the Lawsuits.

45.     AIG first acknowledged notice of the dispute on or around April 10, 2014.

46.     In August 2014, AIG issued a reservation of rights letter to Oracle, acknowledging that the AIG Excess Policy followed form to the Primary Policy, requesting coverage communications from the primary carrier Beazley, and reserving all rights.  AIG did not object to Oracle's choice of counsel or raise any coverage defenses.

47.     After receipt of AIG's acknowledgement and reservation of rights letter, and throughout the pendency of the Lawsuits, Oracle, through its broker, regularly provided written status updates to AIG regarding all material developments in the Cover Oregon Lawsuits, up to and including the point of Settlement.  These updates included:

    a.     Quarterly Cover Oregon Claim written status reports;

    b.     Detailed information provided in March 2016, through Oracle's broker, including access to an Oracle website where select pleadings and key documents regarding the Cover Oregon Lawsuits were posted and made available to all the E&O Insurers, including AIG;

    c.     A written update to AIG on March 17, 2016 regarding total Claims Expenses incurred to date across all Cover Oregon Lawsuits, broken out by the various defense counsel; and

    d.     A confidential pre-mediation memorandum in July 2016 that included a detailed evaluation from trial counsel of the claims, defenses, and evidence to be presented at trial in the State Action.  Oracle also offered to provide the parties' mediation statements if AIG signed a non-disclosure agreement and agreed to be bound by the protective order in the Lawsuits, but AIG did not accept that offer.

48.     In addition to quarterly written updates, between March 2014 and September 2016, Oracle participated in at least seven quarterly telephone calls, arranged by the broker, with

Oracle's E&O Insurers, including AIG, to discuss the ongoing Cover Oregon Lawsuits and provide details respecting Claims Expenses incurred by Oracle across all its counsel.

49.     Throughout these years, AIG did not once object to Oracle's costs incurred in connection with any Cover Oregon Lawsuit, or to Oracle's retention of various defense counsel to execute Oracle's broad defensive strategy in response to the Cover Oregon Claim.

**D.     AIG DOES NOT OBJECT TO THE SETTLEMENT**

50.     On or about July 20, 2016, as part of ongoing settlement discussions with Oregon, Oracle, through its broker, informed AIG and the rest of the E&O Insurers of an upcoming mediation in the State Action, and provided details regarding the settlement posture of the parties.

51.     As part of this July 20, 2016 notice of mediation, Oracle provided to AIG a confidential pre-mediation memorandum prepared by Oracle's lead counsel, and confirmed that Oracle would host a telephone conference after the mediation to provide AIG with updates.

52.     On August 4, 2016, Oracle held the post-mediation conference call as promised, and informed its E&O Insurers that no resolution had been reached at the mediation.

53.     Though the mediation was unsuccessful, on or about September 8, 2016, Oracle held a call with its E&O Insurers, including AIG, in which Oracle described generally the parameters of the settlement terms under discussion, namely, that Oracle would pay a monetary amount to reimburse Oregon for its attorneys' fees in the State Action and fund "STEM" education in Oregon schools, plus provide free software licenses and technical support to the State, and all Lawsuits in connection with the Cover Oregon Claim would be simultaneously resolved.

54.     AIG did not make any objection to Oracle moving forward with settlement or to the terms presented.

55.     On or about September 19, 2016, Oracle informed its E&O Insurers that it had settled the State Action with a $35 million cash component, along the lines of the terms discussed during the September 8, 2016 call, and that all Lawsuits had been dismissed.

56.     In December of 2016, Oracle's primary carrier Beazley agreed to pay Oracle its full policy limit under the Primary Policy.

**E.     AIG REFUSES TO PAY FOR ORACLE'S DEFENSE AND INDEMNITY COSTS**

57.     Once Beazley agreed to pay its full limit, on or about January 10, 2017, Oracle wrote to AIG seeking reimbursement of millions of dollars for Oracle's remaining defense and settlement costs in excess of the Primary Policy limit and Oracle's self-insured retention, up to the AIG Excess Policy limit.

58.     In addition to its specific written demand, Oracle followed up with phone calls and subsequent written requests to AIG to honor its obligations under the AIG Excess Policy and tender payment to Oracle.

59.     Between February and July of 2017, during which time Oracle repeatedly sought payment, AIG gave no indication to Oracle of whether it intended to pay or refuse payment for any amount in connection with the Cover Oregon Claim and Lawsuits.

60.     By letter dated July 19, 2017, AIG for the first time denied any obligation to pay anything toward Oracle's Claims Expenses.

61.     AIG based its July 2017 denial on three grounds it had never raised before. Specifically, it contended that only litigation costs for "defensive" claims or Lawsuits were subject to coverage, and that such litigation costs did not exceed the self-insured retention plus the underlying Primary Policy coverage limit.  AIG also asserted that two exclusions in the Primary Policy barred coverage for the fraud, Oregon False Claims Act, and RICO claims alleged in the State Action.

62.    In late August 2017, Oracle responded to AIG's denial and explained why AIG's positions had no merit.  First, Oracle confirmed that the affirmative claims, Lawsuits, and all defense counsels' work were interconnected and part of Oracle's successful overall defense to the Cover Oregon Claim.  Second, Oracle explained that the State's non-contract causes of action had no independent basis, but instead were legal theories based on the same set of core facts underlying the breach of contract claim.  In addition, the Primary Policy's "fraud" exclusion, relied upon by AIG in refusing to pay defense costs related to the causes of action for fraud and violation of Oregon False Claims Act in the State Action, does not apply absent a final adjudication establishing fraudulent or dishonest conduct.  As AIG was informed, no such final adjudication exists here.

63.    On or around November 10, 2017, AIG sent a second denial to Oracle.  In addition to maintaining its prior position respecting coverage and its contention that costs incurred in affirmative Lawsuits and claims were "uncovered," AIG additionally asserted, falsely, that it had not been informed of defense counsel involved in all Cover Oregon Lawsuits, and also that it had not consented to the filing of the affirmative suits, was unaware Oracle would seek reimbursement of its fees incurred in those suits, and did not know of any written demand for money against Oracle until the State Action was filed.

64.    AIG's coverage position, as delineated in its denial letters, is inconsistent with and unsupported by AIG's obligations under the AIG Excess Policy and the Primary Policy.

65.    To this date, AIG has not made any payment to Oracle under the AIG Excess Policy in connection with the Cover Oregon Claim and Lawsuits or the Settlement.

66.    By failing to acknowledge its obligation to pay its limit toward Oracle's Claims Expenses and Damages (for the State Action Settlement), AIG has breached its contractual

obligations to Oracle.  Consequently, an actual and justiciable claim exists between Oracle and AIG.

**FIRST CAUSE OF ACTION**
**(Declaratory Relief – Duty to Pay Claims Expenses and Damages Related to the Cover Oregon Lawsuits and the Settlement)**

67.     Oracle repeats and re-alleges the allegations set forth in the preceding paragraphs 1-66 of this Complaint as if fully set forth herein.

68.     Pursuant to the terms of the AIG Excess Policy and the Primary Policy to which it follows form, AIG agreed to pay Claims Expenses and Damages which Oracle became obligated to pay because of a covered Claim made against Oracle.

69.     Pursuant to the terms of the AIG Excess Policy and the Primary Policy to which it follows form, a Claim includes:  "a written demand received by [Oracle] for money or services, including the service of suit," "a written threat or initiation of a suit against [Oracle] seeking injunctive relief," and a "written request or agreement to toll or waive a statute of limitations relating to a potential Claim described above."

70.     Pursuant to the terms of the AIG Excess Policy and the Primary Policy to which it follows form, Damages is defined to include a "settlement," and Claims Expenses broadly includes:  (i) reasonable and necessary fees charged by defense counsel appointed by the Named Insured; and (ii) "all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal" of not just "a Claim," but also of a "suit or proceeding arising in connection therewith, or circumstance which might lead to a Claim[.]"

71.     Pursuant to the AIG Excess Policy and the Primary Policy to which it follows form, the Cover Oregon Lawsuits all are themselves, or each arose because of, a covered Claim.

72.    Pursuant to the AIG Excess Policy and the Primary Policy to which it follows form, Oracle's fees and costs incurred in the Cover Oregon Lawsuits constitute covered Claims Expenses.

73.    Pursuant to the terms of the AIG Excess Policy and the Primary Policy to which it follows form, the $35 million monetary component of the Settlement constitutes covered Damages.

74.    AIG's obligation to pay its full limit toward Oracle's unreimbursed Claims Expenses and Damages is not exempted by any exclusion in the Primary or AIG Excess Policies.

75.    Oracle has fully complied with all terms, conditions and prerequisites to coverage set forth in the AIG Excess Policy, or has been excused from compliance with such terms, conditions or prerequisites as a result of AIG's breach(es) and/or other conduct.

76.    AIG has failed to fulfill its obligation to pay Oracle's Claims Expenses incurred in the Cover Oregon Lawsuits and to indemnify Oracle for the Damages (*i.e.*, the Settlement), subject to the AIG Excess Policy attachment point and limit of liability.

77.    The controversy between Oracle and AIG is ripe for judicial decision.  A justiciable controversy exists between the parties regarding the existence and scope of AIG's obligations under the AIG Excess Policy to pay Oracle's Claims Expenses and Damages associated with the Cover Oregon Lawsuits.

78.    Pursuant to 28 U.S.C. § 2201, the Court should enter a declaratory judgment in favor of Oracle and against AIG, declaring that AIG is obligated to pay Oracle's Claims Expenses and Damages incurred in connection with the Cover Oregon Lawsuits, subject to the AIG Excess Policy's applicable attachment point and limit.

## SECOND CAUSE OF ACTION
### (Breach of Contract – Duty to Pay Claims Expenses for the Cover Oregon Lawsuits)

79.     Oracle repeats and re-alleges the allegations set forth in the preceding paragraphs 1-78 of this Complaint as if fully set forth herein.

80.     The Cover Oregon Lawsuits all are themselves, or each arose because of, a covered Claim.

81.     Pursuant to the AIG Excess Policy and the Primary Policy to which it follows form, Oracle's fees and costs incurred in the Cover Oregon Lawsuits constitute covered Claims Expenses.

82.     AIG's obligation to pay these Claims Expenses is not exempted by any exclusion in the Primary or AIG Excess Policies.

83.     The Primary Policy's limit of liability and the self-insured retention underlying the Excess Policy have been exhausted by reason of claims paid by Beazley and/or Oracle.

84.     Oracle has fully complied with all terms, conditions and prerequisites to coverage set forth in the AIG Excess Policy, or has been excused from compliance with such terms, conditions or prerequisites as a result of AIG's breach(es) and/or other conduct.

85.     Subject to the AIG Excess Policy's attachment point, AIG has a duty to advance and pay Oracle for these Claims Expenses, which do, in fact, far exceed the AIG Excess Policy attachment point.

86.     AIG breached its obligation to advance or pay Oracle's Claims Expenses incurred in the Cover Oregon Lawsuits, subject to the AIG Excess Policy's attachment point.

87.     As a result of AIG's breach of its obligation to pay Oracle's Claims Expenses resulting from the Cover Oregon Lawsuits, subject to the AIG Excess Policy's attachment point,

Oracle has suffered damages in an amount to be determined at trial, but no less than the full limit of the AIG Excess Policy.

## THIRD CAUSE OF ACTION
### (Breach of Contract – Duty to Pay Settlement Costs)

88.     Oracle repeats and re-alleges the allegations set forth in the preceding paragraphs 1-87 of this Complaint as if fully set forth herein.

89.     Pursuant to the terms of the AIG Excess Policy and the Primary Policy to which it follows form, Damages is expressly defined to include a "settlement."

90.     Oracle has incurred $30 million in Settlement of the State Action, and is obligated to pay an additional $5 million in June 2018, which constitutes covered Damages under the AIG Excess Policy and the Primary Policy to which it follows form.

91.     The Primary Policy's limit of liability and the self-insured retention underlying the AIG Excess Policy have been exhausted by reason of claims paid by Beazley and/or Oracle.

92.     AIG has a duty to indemnify Oracle for these Damages, subject to the AIG Excess Policy's attachment point, which is not exempted by any exclusion in the Primary or AIG Excess Policies.

93.     Oracle has fully complied with all terms, conditions and prerequisites to coverage set forth in the AIG Excess Policy, or has been excused from compliance with such terms, conditions or prerequisites as a result of AIG's breach(es) and/or other conduct.

94.     AIG has breached its obligation to indemnify Oracle for the portion of that $35 million Settlement amount falling within the AIG Excess Policy's layer of coverage.

95.     As a result of AIG's breach of its obligation to indemnify Oracle for Damages, subject to the AIG Excess Policy's attachment point, Oracle has suffered damages in an amount to be determined at trial, but no less than the full limit of the AIG Excess Policy.

## PRAYER FOR RELIEF

WHEREFORE, Oracle prays for relief as follows:

    (a)  On the First Cause of Action, Oracle requests that the Court enter a declaratory judgment in favor of Oracle and against AIG, declaring that AIG is obligated to pay Oracle's Claims Expenses and Damages incurred in connection with the Cover Oregon Lawsuits, subject to the AIG Excess Policy's attachment point, and up to the full limit of liability of the AIG Excess Policy.

    (b)  On the Second Cause of Action, Oracle requests that the Court enter judgment against AIG, awarding Oracle compensatory and consequential damages in an amount to be determined in this action, but no less than the limit of the AIG Excess Policy;

    (c)  On the Third Cause of Action, Oracle requests that the Court enter judgment against AIG, awarding Oracle compensatory and consequential damages in an amount to be determined in this action, but no less than the limits of the AIG Excess Policy;

    (d)  On all Causes of Action, Oracle requests that the Court award Oracle all costs incurred as a consequence of having to prosecute this lawsuit, including attorneys' fees, as well as prejudgment and post-judgment interest; and

    (e)  Additionally, on all Causes of Action, Oracle requests such other and further relief as the Court deems just and proper.

## JURY DEMAND

Oracle hereby demands a trial by jury on all issues so triable.

MCKOOL SMITH, P.C.

By: _____
      Robin L. Cohen
      (rcohen@mckoolsmith.com)
      Adam S. Ziffer
      (aziffer@mckoolsmith.com)

      One Bryant Park, 47th Floor
      New York, NY 10036
      Telephone: (212) 402-9400
      Facsimile:  (212) 402-9444

      *Attorneys for Plaintiff Oracle Corporation*

Dated: April 19, 2018