# EXHIBIT A

## MARSH LTD

**CONTRACT NO.**
QF009013 (1)

### RISK DETAILS

| | |
|---|---|
| **UNIQUE MARKET REFERENCE**: | B0509QF009013 |
| **TYPE**: | Technology Protection |
| **INSURED**: | ORACLE CORPORATION |
| **PRINCIPAL ADDRESS**: | 500 Oracle Parkway, Redwood Shores, CA 94065, USA |

**PERIOD**:　　　　　From:　31st March, 2013
　　　　　　　　　　To:　　31st March, 2014

Both days at 12:01 a.m. local standard time at the Principal Address.

**BUSINESS**:　　　Your design, development, license, sale, support, update or distribution of any products, and any service that you provided or are providing.

**LIMITS**:　　　　　USD ▮▮▮▮▮ each claim and in the annual aggregate, including claims expenses.

Retention:

USD ▮▮▮▮▮ each claim, including claims expenses.

**TERRITORIAL LIMITS**:　Worldwide

**CONDITIONS**:　　1. Wording:  As specified herein

2. Canadian Risk Acknowledgement Endorsement.

3. Service of Suit Clause (Canada) as attached.

# MARSH LTD

**CONTRACT NO.**
QF009013 (1)

---

**CONDITIONS
CONTINUED**:

4. Employed Lawyers Professional Liability Insurance Endorsement as attached.

5. Nuclear Incident Exclusion Clause-Liability-Direct (BROAD) (U.S.A) as attached.

6. Radioactive Contamination Exclusion Clause-Liability-Direct (U.S.A), as attached.

7. War and Civil War Exclusion Clause as attached.

8. LSW 3000 Premium Payment Clause (45 days) as attached.

9. Additional Insured Endorsement as attached.

**CHOICE OF LAW
& JURISDICTION**: As per Policy Wording attached, California.

**PREMIUM**: USD

**PREMIUM
PAYMENT TERMS**: LSW 3000 Premium Payment Clause (45 days).

**TAX(ES) PAYABLE
BY THE INSURED
AND ADMINISTERED
BY INSURERS**: As per Tax Schedule 'A' attached.

**TAXES PAYABLE
BY INSURERS
AND ADMINISTERED
BY THE INSURED OR
THEIR AGENT:** As agreed by Insurers.

**INSURER CONTRACT
DOCUMENTATION**: This document details the contract terms entered into by the Insurer(s) and constitutes the contract document.

CONTRACT NO.
QF009013 (1)

In respect of Canadian business covered hereunder, Lloyd's Syndicates hereon confirm that they have mandated the Lloyd's Attorney-In-Fact for Canada to bind on their behalf.

**INTENTION FOR AIF TO BIND CLAUSE**

Whereas Lloyd's Underwriters have been granted an order to insure in Canada risks under the Insurance Companies Act (Canada) and are registered in all provinces and territories in Canada to carry on insurance business under the laws of these jurisdictions or to transact insurance in these jurisdictions.

And whereas applicants for insurance coverage in respect of risks located in Canada and Canadian Cedants wish that Lloyd's insurance and reinsurance coverage be provided in a manner that requires Lloyd's Underwriters to vest assets in trust in respect of their risks pursuant to the Insurance Companies Act (Canada);

a)   An endorsement in the form of LMA3105 (Amended)/3107 (Amended) as appropriate (the "Canadian Endorsement") shall be in force and shall be the governing contract pending the decision by Lloyd's Underwriters' attorney and chief agent in Canada (the "AIF") to confirm coverage in accordance with both the terms and conditions set out in the Canadian Endorsement and applicable Canadian law;

b)   The AIF shall confirm Lloyd's Underwriters' coverage by signing in Canada a policy that will contain the terms and conditions set out in the Canadian Endorsement (the "Canadian Policy"), and by communicating from Canada the issuance of that policy to the policyholder or his broker;

c)   The Canadian Endorsement shall cease to have effect upon the communication by the AIF from Canada of the Canadian Policy to the policyholder or his broker, and the Canadian Policy will replace and supersede the endorsement.

01/11/11
LMA5181 (Amended)

**MARSH LTD**

**CONTRACT NO.**
QF009013 (1)

---

**CANADIAN GLOBAL SLIP ENDORSEMENT AND INTERLOCKING CLAUSE**

It is hereby understood and agreed that -

1.  a separate contract in the form of LMA3105 (Amended)/3107 (Amended) as appropriate ( the "Canadian Endorsement") shall apply to the Canadian portion of the risks that would otherwise be (re)insured by the Lloyd's Underwriters under this Global Contract.

2.  the total liability of the Lloyd's Underwriters under the Canadian Endorsement and under this Global Contract shall not exceed their proportion of the total (re)insurance coverage amount specified in this Global Contract and liability under this Canadian Endorsement for the Canadian risks remains limited by the provisions of this Global Contract.

3.  in respect of the Canadian Endorsement a separate contract (the Canadian Policy) will be issued by Lloyd's Underwriters' attorney and chief agent in Canada to replace the Canadian Endorsement and in that regard LMA5181(Amended)/5182 as appropriate will apply.

01/11/11
LMA5179 (Amended)

## MARSH LTD

**CONTRACT NO.**
QF009013 (1)

---

### AFB MEDIA TECH

### PROFESSIONAL AND TECHNOLOGY BASED SERVICES, TECHNOLOGY PRODUCTS, COMPUTER NETWORK SECURITY, MULTIMEDIA AND ADVERTISING AND HEALTH CARE CONSULTANT PROFESSIONAL LIABILITY INSURANCE

### DECLARATIONS
### THIS IS A CLAIMS-MADE AND REPORTED LIABILITY INSURANCE POLICY.  PLEASE READ CAREFULLY.

**POLICY NUMBER:** QF009013

1. **NAMED ASSURED:**

   ORACLE CORPORATION

   **ADDRESS:**
   500 Oracle Parkway,
   Redwood Shores,
   CA 94065,
   USA

2. **POLICY PERIOD:**
   **FROM:**  31st March 2013
   **TO:**  31st March 2014
   Both days at 12:01 a.m. local standard time at the Principal Address.

3. **LIMIT OF LIABILITY:**
   USD              each **claim** and in the annual aggregate, inclusive of **claims expenses**

   But Sub Limited to:-

   (a) USD              in the aggregate for the **Policy Period** for all **Privacy Notification Costs**  covered under Insuring Clause C.3

   (b) USD              in the aggregate for the **Policy Period** for all **Claims Expenses** and **Penalties** covered under Insuring Clause C.4

   The above sub limits of liability are part of, and not in addition to, the overall limit of liability referred to above.

4. **RETENTION:**
   USD              each and every **claim,** includes **claims expenses**.

**CONTRACT NO.**
QF009013 (1)

---

**GROSS PREMIUM:**

USD ▮▮▮▮▮▮

**6.    RETROACTIVE DATE:**

1st June 1985 except with respect to:

J.D Edwards, Inc and its subsidiaries for which it means 1st September 1987

Hyperion Solutions, Inc and its subsidiaries for which it means 1st May 1991

BEA Systems, Inc and its subsidiaries for which it means 8th November 1995

Sun Microsystems, Inc and its subsidiaries for which it means 4th March 1997

Peoplesoft, Inc and its subsidiaries for which it means 20th June 2001

Siebel Systems, Inc and its subsidiaries for which it means 31st January 2006

**7.    NOTICE OF CLAIM TO:**

Beth Diamond
1270 Avenue of the Americas
12th Floor, New York
NY 10020
tmbclaims@beazley.com

**8.    NOTICE OF ELECTION:**
Marsh Risk & Insurance Services
One California Street
San Francisco
California 94111

**9.    SERVICE OF SUIT:**

Clyde & Co
505 Montgomery Street
10th Floor
San Francisco
CA 94111
USA

**10.   CHOICE OF LAW:**
California

**CONTRACT NO.**
QF009013 (1)

---

**PROFESSIONAL AND TECHNOLOGY BASED SERVICES, TECHNOLOGY PRODUCTS, COMPUTER NETWORK SECURITY, PRIVACY LIABILITY AND MULTIMEDIA AND ADVERTISING LIABILITY INSURANCE POLICY**

NOTICE:  This Coverage is provided on a Claims Made and Reported Basis.  Except as otherwise provided, this coverage applies only to **Claims** first made against the **Insured** and reported to the Underwriters during the **Policy Period or Extended Reporting Period** (if applicable).  The Limit of Liability available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**.  Please review the coverage afforded under this Insurance Policy carefully and discuss the coverage hereunder with your insurance agent or broker.

The Underwriters agree with the Named Insured, set forth at Item 1. of the Declarations made a part hereof, in consideration of the payment of the premium and reliance upon the statements in the **Application** which is made a part of and attached to this Insurance Policy (hereinafter referred to as the "Policy" or "Insurance") and subject to the Limit of Liability, deductible, exclusions, conditions and other terms of this Insurance:

I.      **INSURING CLAUSES**

A.      **Professional and Technology Based Services Coverage**

To pay on behalf of any **Insured**:

**Damages** and **Claims Expenses**, in excess of the Each **Claim** Deductible, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** and reported in writing to the Underwriters during the **Policy Period** or **Optional Extension Period** (if applicable) arising out of any negligent act, error or omission, misstatement or misleading statement or any unintentional breach of contract, in rendering or failure to render **Professional Services** or **Technology Based Services** on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period** by the **Insured** or by any person or entity, including an independent contractor, for whose negligent act, error or omission, misstatement or misleading statement or unintentional breach of contract the **Insured Organization** is legally responsible.

B.      **Technology Products Coverage**

To pay on behalf of any **Insured**:

**Damages** and **Claims Expenses**, in excess of the Deductible, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** and reported to the Underwriters during the **Policy Period** or **Optional Extension Period** (if applicable) arising out of:

**CONTRACT NO.**
QF009013 (1)

1.   any negligent act, error or omission, or any unintentional breach of contract, by the Insured on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period** that results in the failure of **Technology Products** to perform the function or serve the purpose intended; or

2.   infringement of copyright committed by the **Insured** on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period** with respect to software **Technology Products**.

C.   **Computer Network Security and Privacy Coverage**

1.   **Computer Network Security Coverage**

To pay on behalf of the **Insured**:

**Damages** and **Claims Expenses**, in excess of the Each **Claim** Deductible, which the **Insured** shall become legally obligated to pay because of any **Claim** first made against any **Insured** and reported to the Underwriters during the **Policy Period** or **Optional Extension Period** (if applicable) arising out of any act, error or omission on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period** in the course of providing or managing **Computer Systems** security by the **Insured** or by any person or organization, including an independent contractor, for whose act, error or omission the **Insured Organization** is legally responsible that results in:

(a)   the inability of a third party, who is authorized to do so, to gain access to **Computer Systems** or your **Technology Based Services**;

(b)   the failure to prevent **Unauthorized Access** to **Computer Systems** that results in:

(1)   the destruction, alteration, deletion, corruption or damage of electronic data on **Computer Systems**;

(2)   **Theft of Data** from **Computer Systems**; or

(3)   the participation by the **Insured Organization's Computer System** in denial of service attacks against third party Internet sites or computers; or

(c)   the failure to prevent transmission of **Malicious Code** from **Computer Systems** to third party computers and systems.

**CONTRACT NO.**
QF009013 (1)

2. **Privacy Liability**

To pay on behalf of the **Insured**:

**Damages** and **Claims Expenses**, in excess of the Deductible, which the **Insured** shall become legally obligated to pay because of any **Claim**, including a **Claim** for violation of a privacy law, first made against any **Insured** and reported to the Underwriters during the **Policy Period** or **Optional Extension Period** (if applicable) for:

(a)    theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information** or **Third Party Corporate Information** that is in the care, custody or control of the **Insured Organization** or a third party for whose theft, loss or **Unauthorized Disclosure** the **Insured Organization** is legally responsible (a third party shall include a Business Associate as defined by the Health Insurance Portability and Accountability Act ("HIPAA")), provided such theft, loss or **Unauthorized Disclosure** takes place on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period**;

(b)    the **Insured Organization's** failure to timely disclose an incident described in Insuring Clause C.1.(b)(2) or C.2.(a) in violation of any **Breach Notice Law**; provided such incident giving rise to the **Insured Organization's** obligation under a **Breach Notice Law** must take place on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period**;

(c)    failure by the **Insured** to comply with that part of a **Privacy Policy** that specifically:

    (1)    prevents or prohibits improper or intrusive collection of **Personally Identifiable Non-Public Information** from a person;

    (2)    requires notice to a person of the **Insured Organization's** collection or use of, or the nature of the collection or use of his or her **Personally Identifiable Non-Public Information**;

    (3)    provides a person with the ability to assent to or withhold assent for (e.g. opt-in or opt-out) the **Insured Organization's** collection or use his or her **Personally Identifiable Non-Public Information**;

    (4)    prohibits or restricts the **Insured Organization's** disclosure, sharing or selling of a person's **Personally Identifiable Non-Public Information**;

CONTRACT NO.
QF009013 (1)

---

(5)     requires the **Insured Organization** to provide access to **Personally Identifiable Non-Public Information** or to correct incomplete or inaccurate **Personally Identifiable Non-Public Information** after a request is made by a person; or

(6)     mandates procedures and requirements to prevent the loss of **Personally Identifiable Non-Public Information**;

provided the acts, errors or omissions that constitute such failure to comply with a **Privacy Policy** must take place on or after the Retroactive Date set forth in Item 6. of the Declarations and before then end of the **Policy Period**, and the **Insured Organization** must, at the time of such acts, errors or omissions have in force a **Privacy Policy** that addresses those subsections above that are relevant to such **Claim**.

(d)     failure by the **Insured** to administer an identity theft prevention program or take necessary actions to prevent identity theft required by governmental statute or regulation; provided the acts, errors or omissions that constitute such failure must first take place on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period**.

3.     **Privacy Notification Costs**

To indemnify the Named Insured for:

**Privacy Notification Costs**, in excess of the Deductible and incurred by the **Insured Organization** with the Underwriters' prior written consent, resulting from the **Insured Organization's** legal obligation to comply with a **Breach Notice Law** because of an incident (or reasonably suspected incident) described in Insuring Clause C.1.(b)(ii) or C.2.(a) that first takes place on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period**; provided such incident or suspected incident must be reported to the Underwriters during the **Policy Period** or **Optional Extension Period**, if applicable;

**Privacy Notification Costs** means reasonable and necessary:

(a)     costs to hire a computer security expert to determine the existence of and cause of any theft or unauthorized disclosure of information;

(b)     costs to provide notification to

    (1)     individuals who are required to be notified by the applicable **Breach Notice Law**; and

    (2)     in the Underwriters' discretion, to individuals affected by an incident in which their **Personally Identifiable Non-Public Information** has been subject to theft, loss, or **Unauthorized Disclosure** in a manner which compromises the security or privacy of such individual by posing a significant risk of financial, reputational or other harm to the individual;

(c)     fees charged by an attorney to determine the applicability of and actions necessary to comply with **Breach Notice Laws**; and

(d)     costs of a credit file monitoring and public relations program, to be approved by the Underwriters, consisting of:

    (1)     the offering of one (1) year of credit monitoring services to those individuals whose **Personally Identifiable Non Public Information** was compromised or reasonably believed to be compromised as a result of the theft or unauthorized disclosure of information giving rise to the notification requirement;

    (2)     mailing and other reasonable third party administrative costs associated with such program including access to call centers; and

    (3)     costs of a public relations consultancy, not to exceed USD ▮▮▮▮ .

Provided all such costs under subsection (d) above must be incurred within one (1) year of discovery of such theft or unauthorized disclosure of information, be for the purpose of mitigating potential **Damages** resulting from such theft or unauthorized disclosure of information.

**Privacy Notification Costs** shall not include any internal salary or overhead expenses of the **Insured Organization**.

4.     **Regulatory Defense and Penalties**

To pay on behalf of the **Insured**:

**MARSH LTD**                                               PAGE 12 OF 58

CONTRACT NO.
QF009013 (1)

Claims Expenses and **Penalties** in excess of the Deductible, which the **Insured Organization** shall become legally obligated to pay because of any **Claim** in the form of a **Regulatory Proceeding** first made against any **Insured** resulting from a violation of a **Privacy Law** and caused by an incident described in Insuring Clause C.2. (a) or (b) that takes place on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period.**

D.   **Multimedia and Advertising Coverage**

To pay on behalf of any **Insured**:

**Damages** and **Claims Expenses**, in excess of the Each **Claim** Deductible, which the **Insured** shall become legally obligated to pay because of liability imposed by law or **Assumed Under Contract** resulting from any **Claim** first made against any **Insured** and reported to the Underwriters during the **Policy Period** or **Optional Extension Period** (if applicable) arising out of one or more of the following acts committed on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period** in the course of the **Insured Organization's** performance of **Professional Services**, **Media Activities** or **Technology Based Services**:

1.   defamation, libel, slander, product disparagement, trade libel, prima facie tort, infliction of emotional distress, outrage, outrageous conduct, or other tort related to disparagement or harm to the reputation or character of any person or organization;

2.   invasion of or interference with the right to privacy or of publicity;

3.   misappropriation of any name or likeness for commercial advantage;

4.   false arrest, detention or imprisonment or malicious prosecution;

5.   invasion of or interference with any right to private occupancy, including trespass, wrongful entry or wrongful eviction;

6.   plagiarism, piracy or misappropriation of ideas under implied contract;

7.   infringement of copyright;

8.   infringement of trade dress, domain name, title or slogan, or the dilution or infringement of trademark or service mark;

9.   negligence regarding the content of any **Media Communication**, including harm caused through any reliance or failure to rely upon such content;

10.  misappropriation of trade secret; and

CONTRACT NO.
QF009013 (1)

11. with respect to **Media Activities**, unfair competition in the form of an unlawful attempt to imitate a business rival's or competitor's goods, services, trademark, trade dress, or services mark, but only if alleged in connection with a **Claim** for infringement under Insuring Clause D.7. or D.8.

Provided, Insuring Clauses A., B., C. and D. of this Insurance shall not apply to any **Claim** for or arising out of the disclosure, misuse or misappropriation of any ideas, trade secrets or confidential information that came into the possession of any person prior to the date he or she became an employee, officer, director, principal or partner of the **Insured Organization**.

## II. DEFENSE, SETTLEMENT, AND INVESTIGATION OF CLAIMS

A. It shall be the duty of the **Insured** and not the duty of Underwriters to defend **Claims**, provided that the Underwriters shall have the right and shall be given the opportunity to effectively associate with the **Insured** in the investigation, defense and settlement of any **Claim** that appears reasonably likely to be covered in whole or in part hereunder. The Named Insured shall have the right to select defense counsel.

Subject to the payment of the Deductible as provided in Clause VIII. and allocation pursuant to Clause II.B. below, the Underwriters shall advance, on behalf of the **Insureds**, **Claims Expenses** which the **Insureds** have incurred prior to the final disposition of such **Claim**:

1. for any **Claim** against the **Insured** seeking **Damages** which are payable under the terms of this Policy

2. for any **Claim** seeking injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction) or a regulatory proceeding as described in Clause VI.F.3:

   (a) the **Claim** is first made and reported to the Underwriters during the **Policy Period** or **Extended Reporting Period** (if applicable); and

   (b) the act or acts were committed on or after the Retroactive Date and before the end of the **Policy Period** in the course of the **Insured**'s performance of **Professional Services**, **Media Activities** or **Technology Based Services**; and

3. under Insuring Clause C.4., for any **Claim** in the form of a **Regulatory Proceeding**

CONTRACT NO.
QF009013 (1)

provided that to the extent it is finally established that any such **Claims Expenses** are not covered under this Policy, the **Named Insured** shall repay such **Claims Expenses** to the Underwriters. The Underwriters shall pay **Claims Expenses** no more than once every 90 days.

B.      If **Damages** and/or **Claims Expenses** covered by this Policy are incurred along with costs, expenses and losses not covered by this Policy, then the **Insured** and the Underwriters agree to allocate such amount between covered **Damages** and/or **Claims Expenses** and any non-covered costs, expenses or losses based upon the relative legal exposures and the relative benefits obtained by the parties. The Underwriters shall not be liable under this Policy for the portion of such amount allocated to non-covered costs, expenses or losses**.**

In the event that a method of allocation cannot be agreed upon by the Underwriters and the **Insured**, then:

1.      in any arbitration, suit or other proceeding, no presumption shall exist concerning what is a fair and reasonable allocation;

2.      the Underwriters shall advance the amount of **Claims Expenses** which they deem fair and proper until a different amount is either negotiated by the parties, determined pursuant to the arbitration process set forth in Clause II.B.3. below, or determined judicially; and

3.      if requested by the **Insured**, the Underwriters shall submit the dispute to binding arbitration. The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel, which shall consist of one arbitrator selected by the **Insured**, one arbitrator selected by the Underwriters, and a third independent arbitrator selected by the other two arbitrators.

C.      Any negotiated, arbitrated or judicially determined allocation of **Claims Expenses** arising out of a **Claim** shall be applied retroactively to all **Claims Expenses** arising out of such **Claim**, notwithstanding any prior advancement to the contrary.  Any allocation or advancement of **Claims Expenses** on account of a **Claim** shall not apply to or create any presumption with respect to the allocation of other loss on account of such **Claim**.

D.      Only those **Damages** and **Claims Expenses** that exceed the Each **Claim** Deductible which have been consented to by the Underwriters shall be recoverable under the terms of this Policy. The Underwriters agree that the **Insured** may settle any **Claim** where the **Damages** and **Claims Expenses** do not exceed the Each **Claim** Deductible provided the entire **Claim** is resolved and the Insured receives a full release from all claimants.  The Underwriters' consent to payment of **Claims Expenses** shall not be unreasonably withheld or delayed.

**CONTRACT NO.**
QF009013 (1)

The Limit of Liability available to pay **Damages** shall be reduced and may be completely exhausted by payment of **Claims Expenses**. **Damages** and **Claims Expenses** shall be applied against the Deductible.

E.   It is further provided that the Insurer shall not be obligated to pay any **Damages**, **Penalties**, **Privacy Notification Costs** or **Claims Expenses** after the applicable Limit of Liability has been exhausted by payment of **Damages, Penalties**, **Privacy Notification Costs** or **Claims Expenses** or after deposit of the applicable Limit of Liability in a court of competent jurisdiction.

## III.   THE INSURED AND THE INSURED ORGANIZATION

As used throughout this Policy, whether expressed in singular or plural, "**Insured**" shall mean:

A.   The Named Insured and any **Subsidiaries** of the Named Insured (together the "**Insured Organization**");

B.   A director or officer of a corporation, member of the board of managers of a limited liability company or management committee member of a joint venture or partnership of the **Insured Organization**, and any person serving in a functionally equivalent role for any **Subsidiary** operating or organized outside the United States, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

C.   An employee, leased employee, part time, voluntary, temporary or seasonal employee, or an **Independent Contractor** of the **Insured Organization**, but only for work done while acting within the scope of his or her employment or engagement and related to the conduct of the **Insured Organization's** business;

D.   Any person who previously qualified as an **Insured** under B or C above prior to the termination of the required relationship with the **Insured Organization**, but only with respect to the performance of his or her duties as such on behalf of the **Insured Organization**;

E.   The estate, heirs, executors, administrators, assigns and legal representatives of any **Insured** in the event of such **Insured's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Insured** would otherwise be provided coverage under this Insurance;

CONTRACT NO.
QF009013 (1)

---

F.      the lawful spouse or domestic partner of any of the persons set forth in B, C or D above, but only to the extent the spouse or domestic partner is a party to any Claim solely in the capacity as spouse or domestic partner of any such persons and only for the purposes of any Claim seeking Damages recoverable from marital community property, property jointly held by any such person and the spouse, or property transferred from any such person to the spouse or domestic partner;

G.      An **Additional Insured**, but only as respects the vicarious liability of such person or entity for negligent acts, errors or omissions of the **Insured Organization** otherwise covered by this Insurance.

**Additional Insured** means:

1.      any natural person or entity that the **Insured Organization** is required by written agreement to add as an **Additional Insured** under this policy prior to the commission of any act for which such person or entity would be provided coverage for under this Policy, but only to the extent required by such written agreement and only to the extent the **Insured Organization** would have been liable and coverage would have been afforded under the terms and conditions of this Policy had such **Claim** been made against the **Insured Organization**; and

2.      any other person or entity added an **Additional Insured** by endorsement to this Policy.

## IV.     TERRITORY

This Insurance applies to **Claims** made and acts, errors or omissions committed anywhere in the world, unless prohibited by law.  Where legally permissible, loss of any entity Insured shall also be deemed to be loss of the Named Insured within the United States of America.

## V.      EXCLUSIONS

The coverage under this Insurance does not apply to **Damages, Penalties** or **Claims Expenses** in connection with or resulting from any **Claim**, or to any **Privacy Notification Costs**:

A.      With respect to Insuring Clauses A., B. and D., arising out of or resulting from any criminal (except where such criminal act is based on unintentional conduct) dishonest, fraudulent or malicious act, error or omission committed by any **Insured**; however, this Policy shall apply to **Claims Expenses** incurred in defending any such **Claim** alleging the foregoing until such time as there is a final adjudication, judgment, binding arbitration decision or conviction against the **Insured**, or written admission by the **Insured,** establishing such conduct, at which time the Named Insured shall reimburse the Underwriters for all **Claims Expenses** incurred defending the **Claim** and the Underwriters shall have no further liability for **Claims Expenses**;

With respect to Insuring Clause C.:

1.    against any individual **Insured** if the **Claim** arises out of or relates to any criminal (except where such criminal act is based on unintentional conduct), dishonest, fraudulent or malicious act, error or omission, any **Security Breach**, intentional violation of a **Privacy Policy,** or intentional or knowing violation of the law, if committed by such **Insured** or by others if such **Insured** colluded or participated in any such conduct or activity; or

2.    against the **Insured Organization** if the **Claim** (or obligation to incur **Privacy Notification Costs**) arises out of or results from any criminal (except where such criminal act is based on unintentional conduct), dishonest, fraudulent or malicious act, error or omission, any **Security Breach**, intentional violation of a **Privacy Policy,** or intentional or knowing violation of the law, if committed by any of the **Insured Organization's**, Chief Executive Officer, Chief Financial Officer, General Counsel (and including any attorneys employed within the General Counsel's office) or Risk Manager , or any person in participation or collusion with any of the **Insured Organization's** Chief Executive Officer, Chief Financial Officer, General Counsel (and including any attorneys employed within the General Counsel's office) or Risk Manager

B.    Arising out of or resulting from any act, error or omission committed prior to the inception date of this Insurance:

1.    if any of the **Chief Executive Officer, Chief Financial Officer, General Counsel or Risk Manager of the Named Insured** on or before 1st June, 2002 knew or could have reasonably foreseen that such act, error or omission might be expected to be the basis of a **Claim**; or

2.    in respect of which any **Insured** has given notice of a circumstance which might lead to a **Claim** to the insurer of any other policy in force prior to the inception date of this Policy;

C.    Arising out of any related or continuing acts, errors or omissions where the first such act, error or omission was committed prior to the Retroactive Date set forth in Item 6. of the Declarations;

D.    For **Bodily Injury** or **Property Damage**; provided, this exclusion shall not apply to any **Claim**:

1.    arising directly our of any act, error or omission in rendering or failure to render **Professional Services** or **Technology Based Services**;

**MARSH LTD**

CONTRACT NO.
QF009013 (1)

---

2. arising directly out of any one or more of the acts listed in Insuring Clause C. in the course of managing **Computer Systems** security or from the loss or theft of **Personally Identifiable Non-Public Information**; or

3. arising directly out of any one or more of the acts listed in Insuring Clause D. in the course of the **Insured Organization's** performance of **Professional Services**, **Media Activities** or **Technology Based Services**,

which is otherwise covered under the terms of this Policy.

As a condition of the application of this exception to Exclusion D., the Named Insured shall maintain during the term of this Policy a Commercial General Liability policy including Products and Completed Operations, and any coverage under this Policy is excess to the coverage provided by such Commercial General Liability policy.

E. Arising out of or resulting from any contractual liability or obligation, or arising out of or resulting from breach of contract or agreement either oral or written, except:

1. with respect to Insuring Clause A. for breach of an agreement by the **Insured Organization** to perform **Professional Services** or **Technology Based Services**; or Insuring Clause B. for breach of an agreement by the **Insured Organization** to manufacture, develop, create, distribute, license, lease or sell **Technology Products**; provided, this exception to Exclusion V.E.1. shall not apply to liability assumed in any hold harmless or indemnity agreement other than liability assumed in any hold harmless or indemnity agreement with respect to intellectual property rights;

2. with respect to Insuring Clause D. for liability:

   (a) **Assumed under Contract**; or

   (b) misappropriation of ideas under an implied contract;

3. with respect to Insuring Clauses C.1.(b)(2) and C.2.(a), to any obligation of the **Insured Organization** to maintain the confidentiality or security of **Personally Identifiable Non-Public Information** or of **Third Party Corporate Information**; or

4. to the extent the **Insured** would have been liable in the absence of such contract or agreement;

CONTRACT NO.
QF009013 (1)

F.      For or arising out of or resulting from:

      1.      breach of any express warranty or representation except for an agreement to perform within a reasonable standard of care or skill consistent with applicable industry standards or for breach of any implied statutory term concerning necessary quality, safety or fitness, or breach of any other contractual obligation which goes beyond an express or implied duty to exercise a degree of care or skill as is consistent with applicable industry standards;

      2.      breach of guarantee or any promises of cost savings, profits, or return on investment; or

      3.      delay in delivery or performance, or failure to deliver or perform at or within an agreed upon period of time, but this exclusion shall not preclude coverage if such delay or failure to deliver or perform is a consequence of an act error or omission committed during the course of providing **Professional Services, Technology Based Services** or **Technology Products** if the **Insured** has made reasonably diligent efforts to deliver or perform such **Professional Services, Technology Based Services** or **Technology Products**;

G.      For or arising out of or resulting from:

      1.      inaccurate, inadequate, or incomplete description of the price of goods, products or services;

      2.      cost guarantees, cost representations, or contract price estimates of probable costs or cost estimates actually or allegedly being exceeded;

      3.      the failure of the **Insured Organization's** goods, products, or services to conform with any represented quality or performance contained in **Advertising**; or

      4.      any actual or alleged gambling, contest, lottery, promotional game or other game of chance;

H.      Arising out of or resulting from any actual or alleged obligation of the **Insured** to make licensing fee or royalty payments, including but not limited to the amount or timeliness of such payments;

I.      For or arising out of or resulting from any costs or expenses incurred or to be incurred by the **Insured** or others for:

      1.      the reprinting, recall, removal or disposal of any **Media Material**, including any media or products containing such **Media Material**; or

CONTRACT NO.
QF009013 (1)

    2.     the withdrawal, recall, inspection, repair, replacement, reproduction, removal or disposal of:

        (a)     **Technology Products**, including any products or other property of others that incorporate **Technology Products**;

        (b)     work product resulting from or incorporating the results of **Professional Services** or **Technology Based Services**; or

        (c)     any products or other property on which **Professional Services** or **Technology Based Services** are performed;

however, this exclusion shall not apply to third party **Claims** for the resulting loss of use of such **Media Material** or **Technology Products**, or loss of use of the work product resulting from such **Professional Services** or **Technology Based Services**;

J.     Arising out of or resulting from:

    1.     any failure or malfunction of electrical or telecommunications infrastructure or services, unless under the **Insured Organization's** operational control; provided that this exclusion J.1. shall not apply to an otherwise covered **Claim** under Insuring Clause A. if such failure or malfunction of electrical or telecommunications infrastructure or services arises solely and directly out of a negligent act, error or omission by the **Insured Organization** in rendering or failing to render **Professional Services** or **Technology Based Services**; or

    2.     fire, flood, earthquake, volcanic eruption, explosion, lighting, wind, hail, tidal wave, landslide, act of God or other physical event;

K.     For or arising out of any actual or alleged antitrust violation, restraint of trade, unfair competition (except as covered by Insuring Clause D.11.), violation of the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, as amended, false, deceptive or unfair trade practices, violation of consumer protection laws (except consumer privacy protection laws for **Claims** under Insuring Clause C.) or false or deceptive or misleading advertising;

L.     Brought by or on behalf of the Federal Trade Commission, the Federal Communications Commission, or any federal, state, local or foreign governmental entity, in such entity's regulatory or official capacity; provided this exclusion shall not apply to:

    1.     a **Claim** by a government entity brought in its capacity as a customer of the **Insured Organization** arising in the course of the **Insured Organization's** provision of **Professional Services, Technology Based Services, Media Activities** or **Technology Products** to such government entity pursuant to a written agreement between such government entity and the **Insured Organization**; or

**MARSH LTD**                                    PAGE 21 OF 58

CONTRACT NO.
QF009013 (1)

---

      2.    coverage provided under Insuring Clause C.4.;

M.    For or arising out of actual or alleged

      1.    infringement of patent or patent rights or misuse of patent; or

      2.    misappropriation of trade secret arising out of or related to software or **Technology Products** or other goods or products;

N.    For or arising out of the actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced And Corrupt Organizations Act or RICO), as amended, or any regulation promulgated thereunder or any similar federal law or legislation, or law or legislation of any state, province or other jurisdiction similar to the foregoing, whether such law is statutory, regulatory or common law; however, this exclusion does not apply to any otherwise covered **Claim** under Insuring Clauses C.1.(b), C.2.(a), or C.2.(b), or to paying **Privacy Notification Costs** under Insuring Clause C.3., that results from a theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information**, provided that none of the **Insured Organization's** Chief Executive Officer, Chief Financial Officer, General Counsel (and including any attorneys employed within the General Counsel's office) or Risk Manager participated or colluded in, or is alleged to have participated or colluded in such theft, loss or **Unauthorized Disclosure**;

O.    For or arising out of the actual or alleged violation of any securities law, regulation or legislation, including but not limited to the Securities Act of 1933, the Securities Exchange Act of 1934, the Investment Act of 1940, the Sarbanes-Oxley Act of 2002, any state or provincial blue sky or securities law, any other federal securities law or legislation, or any or similar law or legislation of any state, province or other jurisdiction, or any amendment to the above laws, or any violation of any order, ruling or regulation issued pursuant to the above laws;

P.    By or on behalf of one or more **Insureds** under this Insurance against any other **Insured** or **Insureds** under this Insurance; provided this exclusion shall not apply to:

      1.    an otherwise covered **Claim** under Insuring Clause C.1 (b)(ii) or I.C.2.(a) made by an employee of the **Insured Organization**;

      2.    any **Claim** by or on behalf of an **Additional Insured**; or

      3.    any **Claim** brought by or on behalf of an employee of the **Insured** in his or her capacity as a customer of the **Insured**;

CONTRACT NO.
QF009013 (1)

Q.  Made by any business enterprise in which any **Insured** has greater than a fifteen percent (15%) ownership interest or made by any parent company or other entity which owns more than fifteen percent (15%) of the Named Insured, or arising out of or resulting from any **Insured's** activities as a trustee, partner, officer, director or employee of any employee trust, charitable organization, corporation, company or business other than that of the **Insured Organization**;

R.  Arising out of **Professional Services**, **Media Activities** or **Technology Based Services**, performed for any entity, or **Technology Products** provided to any entity which:

1.  is operated, managed or controlled by an **Insured** or in which any **Insured** has an ownership interest in excess of fifteen percent (15%); or in which any **Insured** is an officer or director; or

2.  operates, controls or manages the Named Insured, or has an ownership interest of more than fifteen percent (15%) in the Named Insured;

S.  For or arising out of or resulting from:

1.  any employer-employee relations, policies, practices, acts or omissions, or any actual or alleged refusal to employ any person, or misconduct with respect to employees, whether such **Claim** is brought by an employee, former employee, applicant for employment, or relative of such person;

2.  actual or alleged violation of the Fair Labor Standards Act of 1938, the National Labor Relations Act, the Worker Adjustment and Retraining Act of 1988, the Certified Omnibus Budget Reconciliation Act of 1985, the Occupational Safety and Health Act of 1970, any similar law or legislation of any state, province or other jurisdiction, or any amendment to the above law or legislation, or any violation of any order, ruling or regulation issued pursuant to the above laws or legislation;

3.  any actual or alleged discrimination of any kind including but not limited to age, color, race, sex, creed, national origin, marital status, sexual preference, disability or pregnancy;

4.  any actual or alleged acts, errors or omissions related to any of the **Insured Organization's** pension, healthcare, welfare, profit sharing, mutual or investment plans, funds or trusts, including any violation of any provision of the Employee Retirement Income Security Act of 1974 (ERISA) or any similar federal law or legislation, or similar law or legislation of any state, province or other jurisdiction, or any amendment to ERISA or any violation of any regulation, ruling or order issued pursuant to ERISA or such similar laws or legislation; or

**MARSH LTD**

CONTRACT NO.
QF009013 (1)

---

5.    any actual or alleged act, error or omission or breach of duty by any director or officer in the discharge of their duty if the **Claim** is brought by the Named Insured, a **Subsidiary**, or any directors, officers, stockholders, or employees of the Named Insured or a **Subsidiary** in his or her capacity as such;

Provided however, this exclusion shall not apply to an otherwise covered **Claim** brought by an employee under Insuring Clause C.1. or I.C.2.;

T.    With respect to coverage provided under Insuring Clause C.2., arising out of or resulting from wire tapping or bugging, or video cameras; or

U.    Either in whole or in part, directly or indirectly, arising out of or resulting from or in consequence of, or in any way involving:

1.    asbestos, or any materials containing asbestos in whatever form or quantity;

2.    the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind; any action taken by any party in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins; and any governmental or regulatory order, requirement, directive, mandate or decree that any party take action in response to the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of fungi, molds, spores or mycotoxins of any kind, such action to include investigating, testing for, detection of, monitoring of, treating, remediating or removing such fungi, molds, spores or mycotoxins;

The Underwriters will have no duty or obligation to defend any **Insured** with respect to any **Claim** or governmental or regulatory order, requirement, directive, mandate or decree which either in whole or in part, directly or indirectly, arises out of or results from or in consequence of, or in any way involves the actual, potential, alleged or threatened formation, growth, presence, release or dispersal of any fungi, molds, spores or mycotoxins of any kind;

3.    the existence, emission or discharge of any electromagnetic field, electromagnetic radiation or electromagnetism that actually or allegedly affects the health, safety or condition of any person or the environment, or that affects the value, marketability, condition or use of any property; or

**CONTRACT NO.**
QF009013 (1)

---

4.     the actual, alleged or threatened discharge, dispersal, release or escape of   Pollutants; or any governmental, judicial or regulatory directive or request that the **Insured** or anyone acting under the direction or control of the **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize Pollutants.  Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant including gas, acids, alkalis, chemicals, heat, smoke, vapor, soot, fumes or waste.

Waste includes but is not limited to materials to be recycled, reconditioned or reclaimed.

V.     For, arising out of or resulting from (a) the unlawful distribution of email, direct mail, text messages or facsimiles, (b) the unlawful telemarketing or (c) any eavesdropping, wiretapping or unlawful audio or video recording, if such distribution, telemarketing, wire tapping or recording is done by or on behalf of the **Insured Organization**;

## VI.    DEFINITIONS

Wherever used in this Policy in bold face type, the following definitions shall apply.

A.     "**Advertising**" means material which promotes the product, service or business of the **Insured Organization** or others.

B.     "**Application**" means all applications, including any attachments thereto, and all other information and materials submitted or specifically referenced by or on behalf of the **Insured** to the Underwriters in connection with the underwriting of this Policy, or prior policies of which this Policy is a renewal thereof.

C.     "**Assumed Under Contract**" means liability assumed by the **Insured Organization** under a written hold harmless or indemnity agreement regarding the content of **Media Material** used in a **Media Communication**, but only as respects acts for which insurance is afforded under Insuring Clause D.

D.     "**Bodily Injury**" means physical injury, sickness, disease or death of any person, including any mental anguish or emotional distress resulting therefrom.

E.     "**Breach Notice Law**" means any state, federal or foreign statute or regulation that requires notice to persons whose **Personally Identifiable Non-Public Information** was accessed or may reasonably have been accessed by an unauthorized person.

F.     "**Claim**" means;

1.     a written demand received by any **Insured** for money or services, including the service of suit or institution of arbitration proceedings;

**MARSH LTD**                                          PAGE 25 OF 58

CONTRACT NO.
QF009013 (1)

___

2.     a written threat or initiation of a suit against any **Insured** seeking injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction);

3.     with respect to coverage provided under Insuring Clause C.4. only, institution of a **Regulatory Proceeding** against the **Insured Organization**; and

4.     a written request or agreement to toll or waive a statute of limitations relating to a potential **Claim** described above.

Multiple **Claims** arising from the same or a series of related or repeated acts, errors or omissions or from any continuing acts, errors or omissions shall be considered a single **Claim** for the purposes of this Policy, irrespective of the number of claimants or **Insureds** involved in the **Claim**.  All such **Claims** shall be deemed to have been made at the time of the first such **Claim**.

G.     "**Claims Expenses**" means:

1.     reasonable and necessary fees charged by an attorney designated in accordance with Clause II.A.; and

2.     all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceeding arising in connection therewith, or circumstance which might lead to a **Claim**, if incurred by the Underwriters, or by the **Insured** in accordance with Clause II.A.;

3.     premiums for appeal bonds for covered judgments or bonds to release property used to secure a legal obligation, if required for any **Claim** against an **Insured** for a covered act, error or omission, provided however that the Underwriters shall have no obligation to appeal or to obtain bonds;

**Claims Expenses** shall not include any salary, overhead or other charges of or by an **Insured** for any time spent in cooperating in the defense and investigation of any **Claim** or circumstance that might lead to a **Claim** notified under this Policy.

H.     "**Computer Systems**" means computers and associated input and output devices, data storage devices, networking equipment, and back up facilities:

1.     operated by and either owned by or leased to the **Insured Organization**; or

**MARSH LTD**

CONTRACT NO.
QF009013 (1)

2. operated by a third party service provider and used for the purpose of providing hosted computer application services to the **Insured Organization** or for processing, maintaining, hosting or storing the **Insured Organization's** electronic data, pursuant to written contract with the **Insured Organization** for such services.

I. **"Control Group"** means the Chief Executive Officer, Chief Financial Officer, General Counsel or Risk Manager of the Named Insured

J. **"Damages"** means a monetary judgment, award or settlement.

The term **Damages** shall not include or mean:

1. future profits, restitution, disgorgement of unjust enrichment or profits by an **Insured**, or the costs of complying with orders granting injunctive or non-monetary equitable relief;

2. return or offset of fees, charges, or commissions for goods or services already provided or contracted to be provided unless otherwise agreed by Underwriters to mitigate a **Claim**;

3. costs incurred by the **Insured** to correct, re-perform or complete any **Professional Services, Media Activities** or **Technology Based Services**;

4. taxes or loss of tax benefits, or fines, sanctions or penalties assessed against the **Insured**;

5. punitive or exemplary damages, or any damages which are a multiple of compensatory damages, unless insurable by law, provided that for purposes of this provision, the law most favorable to insurability of such damages shall be applied;

6. discounts, coupons, prizes, awards or other incentives offered to the **Insured's** customers or clients;

7. liquidated damages pursuant to a liquidated damages clause in a contract or agreement to the extent that such damages exceed the amount for which the **Insured** would have been liable in the absence of such contract or agreement;

8. any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured**; or

9. matters deemed uninsurable under the law pursuant to which this Policy shall be construed; provided that for purposes of this provision, the law most favorable to insurability shall be applied.

CONTRACT NO.
QF009013 (1)

_____

For purposes of applying exception 5. and 9. above, the most favorable law of the following applicable jurisdictions shall be applied: (a) where the **Claim** is made or brought; (b) where the **Insured Organization** is incorporated or has its principal place of business; (c) where the natural person **Insured** liable for such damages resides (if applicable); and (d) where the Underwriters are incorporated or have their principal place of business.

K.    "**Independent Contractor**" means any natural person independent contractor who performs labor or service for the **Insured Organization** pursuant to a written contract or agreement, where such labor or service is under the exclusive direction of the **Insured Organization**.  The status of an individual as an **Independent Contractor** shall be determined as of the date of an alleged act, error or omission by any such **Independent Contractor**.

L.     "**Malicious Code**" means any virus, Trojan Horse, worm or other similar software program, code or script intentionally designed to insert itself into computer memory or onto a computer disk and spread itself from one computer to another.

M.    "**Media Activities**" means **Media Communications** and/or the creation, gathering, collection or recording of **Media Material** for inclusion in any **Media Communication** in the ordinary course of the **Insured Organization's** business.

N.    "**Media Communication**" means the display, broadcast, dissemination, distribution or release of **Media Material** to the public by the **Insured Organization**.

O.    "**Media Material**" means information in the form of words, sounds, numbers, images, or graphics in electronic, print or broadcast form, including **Advertising**, but does not mean computer software.

P.    "**Optional Extension Period**" means the period of time after the end of the **Policy Period** for reporting **Claims** as provided in Clause X. of this Policy.

P.    "**Penalties**" means:

      1.    any civil fine or money penalty payable to a governmental entity that was imposed in a **Regulatory Proceeding** by the Federal Trade Commission, Federal Communications Commission, or any other federal, state, local or foreign governmental entity, in such entity's regulatory or official capacity; the insurability of **Penalties** shall be in accordance with the law in the applicable venue that most favors coverage for such **Penalties**; and

**MARSH LTD**

CONTRACT NO.
QF009013 (1)

2.      amounts which the Insured is legally obligated to deposit in a fund as equitable relief for the payment of consumer claims due to an adverse judgment or settlement of a **Regulatory Proceeding** (including such amounts required to be paid into a "Consumer Redress Fund"); but and shall not include payments to charitable organizations or disposition of such funds other than for payment of consumer claims for losses caused by an event covered by Insuring Clauses C.1.(b)(ii), C.1.(c), C.2.(a) and C.2.(b);

but shall not mean costs to remediate or improve **Computer Systems**, security or privacy practices, procedures or policies, or costs to protect the confidentiality and/or security of **Personally Identifiable Non-Public Information** from theft, loss or disclosure.

Q.    **"Personally Identifiable Non-Public Information"** means:

1.      information concerning the individual that constitutes "nonpublic personal information" as defined in the Gramm-Leach Bliley Act of 1999, as amended, and regulations issued pursuant to the Act;

2.      medical or heath care information concerning the individual, including "protected health information" as defined in the Health Insurance Portability and Accountability Act of 1996, as amended, and regulations issued pursuant to the Act;

3.      information concerning the individual that is defined as private personal information under statutes enacted to protect such information in foreign countries, for **Claims** subject to the law of such jurisdiction;

4.      information concerning the individual that is defined as private personal information under a **Breach Notice Law**; or

5.      the individual's drivers license or state identification number; social security number; unpublished telephone number; and credit, debit or other financial account numbers in combination with associated security codes, access codes, passwords or pins;

6.      if such information allows an individual to be uniquely and reliably identified or contacted or allows access to the individual's financial account or medical record information but does not include publicly available information that is lawfully made available to the general public from government records.

R.    "**Privacy Law**" means a federal, state or foreign statute or regulation requiring the **Insured Organization** to protect the confidentiality and/or security or **Personally Identifiable Non-Public Information**.

**MARSH LTD**

CONTRACT NO.
QF009013 (1)

S.  "**Privacy Policy**" means the internal or publicly accessible written documents that set forth the **Insured Organization's** policies, standards and procedures for collection, use, disclosure, sharing, dissemination and correction or supplementation of, and access to, **Personally Identifiable Non-Public Information**.

T.  "**Policy Period**" means the period of time between the inception date shown in the Declarations and the effective date of termination, expiration or cancellation of this Insurance and specifically excludes any **Optional Extension Period** or any prior policy period or renewal period.

U.  "**Professional Services**" means professional services performed for others by or on behalf of the **Insured Organization** for a fee (or for free if provided in conjunction with other fee based services or products provided for compensation or to potential or existing customers as an encouragement to purchase such products) but does not include **Technology Based Services**, **Media Activities**, any services involving the creation, development, sale, distribution, installation, licensing or manufacturing of **Technology Products**, or work or activities performed by or on behalf of the **Insured Organization** or for the **Insured Organization** as an accountant, architect, surveyor, health care provider, lawyer, insurance or real estate agent or broker, or civil or structural engineer.

V.  "**Property Damage**" means physical injury to or destruction of any tangible property, including any resulting loss of use thereof.  For the purposes of this definition, the term "tangible property" shall not include computer data, software and programs.

W.  "**Regulatory Proceeding**" means a request for information, civil investigative demand, or civil proceeding commenced by service of a complaint or similar proceeding brought by or on behalf of the Federal Trade Commission, Federal Communications Commission, or any federal, state, local or foreign governmental entity in such entity's regulatory or official capacity in connection with such proceeding.

X.  "**Security Breach**" means **Unauthorized Access** of **Computer Systems**, infection of **Computer Systems** by **Malicious Code** or transmission of **Malicious Code** from **Computer Systems**, whether any of the foregoing is specifically targeted attack or a generally distributed attack.  A series of continuing **Security Breaches** or related or repeated **Security Breaches** shall be considered a single **Security Breach** and be deemed to have occurred at the time of the first such **Security Breach**.

Y.  "**Subsidiary**" means any corporate entity while at least fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors are owned by the Named Insured directly or indirectly, if such entity was so owned on the inception date of this Policy; or:

**MARSH LTD**                                                    PAGE 30 OF 58

CONTRACT NO.
QF009013 (1)

_____

1.  was so owned prior to the inception date of this Policy and was insured under a policy issued by the Underwriters of which this Policy is a renewal;

2.  becomes so owned after the inception date of this Policy provided the revenues of the entity do not exceed twenty percent (20%) of the Named Insured's annual revenues as set forth in their most recent **Application**; or

3.  becomes so owned after the inception date of this Policy provided that if the revenues of the entity exceed twenty percent (20%) of the Named Insured's annual revenues as set forth in their most recent **Application**, the provisions of Clause XVI., Mergers and Acquisitions, must be fulfilled;

provided that this Policy only provides coverage for acts, errors or omissions taking place while the corporate entity is so owned by the Named Insured.

Z.  "**Technology Based Services**" means computer and electronic technology services, including data processing, Internet services, cloud services, data and application hosting, computer systems analysis, security strategy and services, technology consulting and training, custom software programming for a specific client of the **Insured Organization**, computer and software systems installation and integration, computer and software support, and network management services performed by the **Insured**, or by others acting under the **Insured Organization's** trade name, for others for a fee (or for free if provided in conjunction with other fee based services or products provided for compensation or to potential or existing customers as an encouragement to purchase such products), but shall not mean **Technology Products**.

AA.  "**Technology Products**" means a computer or telecommunications hardware or software product, or related electronic product that is created, manufactured or developed by the **Insured Organization** for others, or distributed, licensed, leased or sold by the **Insured Organization** to others for compensation (or for free if provided in conjunction with other fee based services or products provided for compensation or to potential or existing customers as an encouragement to purchase such products) including software updates, service packs and other maintenance releases and training provided for such products.

BB.  "**Theft of Data**" means the unauthorized taking, misuse or disclosure of information on **Computer Systems**, including but not limited to charge, debit, and credit card information, banking, financial, and investment services account information, proprietary information, and personal, private, and confidential information.

**MARSH LTD**                                                    PAGE 31 OF 58

CONTRACT NO.
QF009013 (1)

---

CC.  **"Third Party Corporate Information"** means any trade secret, data, design, interpretation, forecast, formula, method, practice, credit or debit card magnetic strip information, process, record, report or other item of information of a third party not insured under this Policy which is not available to the general public and is provided to the **Insured** subject to a fully executed written confidentiality agreement or which the **Insured Organization** is legally required to maintain in confidence; however, **Third Party Corporate Information** shall not include **Personally Identifiable Non-Public Information**.

DD.  **"Unauthorized Access"** means:

   1.  the use of or access to **Computer Systems** by a person not authorized to do so by the **Insured Organization**; or

   2.  the authorized use of or access to **Computer Systems** in a manner not authorized by the **Insured Organization**.

EE.  **"Unauthorized Disclosure"** means the disclosure of or access to information in a manner that is not authorized by the **Insured Organization** and is without knowledge of, consent, or acquiescence of the **Control Group**.

## VII.  LIMIT OF LIABILITY

The Limit of Liability stated in Item 3.(a) of the Declarations for "Each **Claim**" is the limit of the Underwriters' liability for all **Damages** and **Claims Expenses** arising out of each **Claim**.

The "Aggregate for the Policy Period" stated in Item 3.(b) of the Declarations is the Underwriters' combined total Limit of Liability for all **Damages**, **Penalties**, **Privacy Notification Costs** and **Claims Expenses** arising out of all **Claims** or circumstances which might lead to a **Claim**, or incidents or requirements to comply with a **Breach Notice Law** which are covered under the terms and conditions of this Policy, and neither the inclusion of more than one **Insured** under this Policy, nor the making of **Claims** by more than one person or entity shall increase the Limit of Liability.

The sub-limit of liability stated in Item 3.(b)(1) of the Declarations is the aggregate limit for the **Policy Period** for all **Privacy Notification Costs** covered under Insuring Clause C.3.

The sub-limit of liability stated in Item 3.(b)(2) of the Declarations is the aggregate limit for the **Policy Period**, for all **Claims Expenses** and **Penalties** covered under Insuring Clause C.4.

The Limit of Liability for the **Optional Extension Period** shall be part of and not in addition to the Limit of Liability of the Underwriters for the **Policy Period**.

CONTRACT NO.
QF009013 (1)

VIII.   **DEDUCTIBLE**

The "Each **Claim** Deductible" stated in Item 4.(a) of the Declarations applies separately to each **Claim**. The Each **Claim** Deductible shall be satisfied by monetary payments by the Named Insured, of **Damages** and **Claims Expenses** resulting from **Claims** first made during the **Policy Period** or the **Optional Extension Period** (if applicable) and reported to the Underwriters pursuant to the terms of this policy. Satisfaction of the Each **Claim** Deductible is a condition precedent to the payment by the Underwriters of any amounts hereunder, and the Underwriters shall be liable only for the amounts in excess of such Each **Claim** Deductible subject to the Underwriters' total liability not exceeding the Limits of Liability stated in Items 3.(a) and 3.(b) of the Declarations.

The "Each Incident Deductible" stated in Item 4.(b) of the Declarations applies separately to each incident giving rise to an obligation to incur **Privacy Notification Costs**. The Each Incident Deductible shall be satisfied by monetary payments by the Named Insured of **Privacy Notification Costs**. Satisfaction of the Each Incident Deductible is a condition precedent to the payment by the Underwriters of any amounts hereunder, and the Underwriters shall be liable only for the amounts in excess of such Each Incident Deductible subject to the Underwriters' total liability not exceeding the Limits of Liability stated in Items 3.(a) and 3.(b) of the Declarations.

In the event a **Claim** and/or incident triggers more than one Deductible amount, then as to that **Claim** or incident, the highest of such Deductible amounts shall be deemed the Deductible amount applicable to loss arising from such **Claim** or incident.

The Underwriters shall recognize erosion of the Deductible by any insurer making a payment on behalf of any **Insured** under any of the following policies:

(a)   Tata AIG General Insurance Company Ltd 2300001862 or renewal thereof all policies expressly written excess of such policy, all such policies directly or indirectly renewed, and all direct and indirect renewals of such policies;

(b)   all locally issued international policies similar to those described in (a) above, all policies expressly written excess of such policies, all such policies directly or indirectly renewed, and all direct and indirect renewals of such policies;

provided that erosion of the Deductible will be recognized only to the extent that payments under the policies listed above are for **Damages** or **Claims Expenses** that would otherwise be covered by this Policy.

---

### IX.    INNOCENT INSURED

A.     Whenever coverage under this Insurance would be excluded, suspended or lost because of Exclusion V.A relating to criminal, dishonest, fraudulent or malicious acts, errors or omissions by any **Insured**, and with respect to which any other **Insured** did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge thereof, then the Underwriters agree that such insurance as would otherwise be afforded under this Policy shall cover and be paid with respect to those **Insureds** who did not personally commit or personally participate in committing or personally acquiesce in or remain passive after having personal knowledge of one or more of the acts, errors or omissions described in Exclusion V.A.

This provision is inapplicable to any **Claim** or circumstance that could reasonably be the basis of a **Claim** against the **Insured Organization** arising from acts, errors or omissions known to the **Chief Executive Officer, Chief Financial Officer, General Counsel or Risk Manager of the Insured Organization**.

### X.    NOTICE OF CLAIM, OR CIRCUMSTANCE THAT MIGHT LEAD TO A CLAIM

A.     If any **Claim** is made against the **Insured**, the Named Insured, upon knowledge of such **Claim** by the Chief Executive Officer, Chief Financial Officer, General Counsel or Risk Manager of the Named Insured, shall forward as soon as practicable during the **Policy Period** to the Underwriters through persons named in Item 8.(a) of the Declarations, written notice of such **Claim** in the form of electronic mail,  telecopy, or express or certified mail together with every demand, notice, summons or other process received by the **Insured** or the **Insured's** representative; provided, however, that:

   1.    notwithstanding the foregoing, if any **Claim** is made against the **Insured**, the Named Insured, upon knowledge of such **Claim** by the **Control Group**, may, in lieu of providing notification as soon as practicable, if **Damages**, **Claims Expenses** and/or **Penalties** in connection with any **Claim**:

      (a)    are less than USD ▓▓▓▓▓▓ and the General Counsel and Risk Manager of the Named Insured reasonably evaluate the **Insured's** total exposure to **Damages**, **Claims Expenses** and/or **Penalties** in connection with such **Claim** at less than USD ▓▓▓▓▓ then the **Insured** must provide Underwriters written notice of such **Claim** prior to the end of the **Policy Period**; and



(b)  are at least USD [redacted] but less than USD [redacted], and the General Counsel and Risk Manager of the Named Insured reasonably evaluate the **Insured's** total exposure to **Damages**, **Claims Expenses** and/or **Penalties** in connection with such **Claim** to be at least USD [redacted] but less than USD [redacted] then the **Insured** must provide Underwriters written notice of such **Claim** in the next quarterly bordereau as provided in Clause X.D; and

2.  with respect to any **Claims** first made against the **Insured** during the last ninety (90) days of the **Policy Period**, the **Insured** shall forward as soon as practicable to the Underwriters through persons named in Item 8.(a) of the Declarations written notice of such **Claims** in the form of electronic mail, telecopy, or express or certified mail, but in no event later than sixty (60) days after the end of the **Policy Period**; provided, however, if **Damages**, **Claims Expenses** and/or **Penalties** in connection with any **Claim** are less than USD [redacted] and the General Counsel and Risk Manager of the Named Insured reasonably evaluate the **Insured's** total exposure to **Damages**, **Claims Expenses** and/or **Penalties** in connection with the **Claim** at less than USD [redacted] then reporting is optional, but unless such **Claim** is reported during the **Policy Period** (or as otherwise provided by the Policy), the **Claim** will not be covered.

Z.  If during the **Policy Period** any of the **Control Group** first becomes aware of any circumstance that could reasonably be the basis for a **Claim** it may give written notice of such circumstance to the Underwriters in the form of electronic mail, telecopy, or express or certified mail through persons named in Item 8.(a) of the Declarations as soon as practicable (including in a quarterly bordereau as provided in Clause X.D. below) during the **Policy Period**. If notice of such circumstance is given, it shall include:

1.  the specific details of the act, error or omission in the provision of **Professional Services**, **Media Activities** or **Technology Based Services** or relating to **Technology Products** that could reasonably be the basis for a **Claim**;

2.  the injury or damage which may result or has resulted from the circumstance;

3.  the facts by which the **Control Group** first became aware of the act, error or omission; and

4.  the identity of any external counsel consulted in connection with such circumstance.

CONTRACT NO.
QF009013 (1)

then any subsequent **Claim** made against the **Insured** arising out of such circumstance who is the subject of the written notice will be deemed to have been made at the time written notice complying with the above requirements was first given to the Underwriters.

AA.   A **Claim** shall be considered to be reported to the Underwriters when written notice is first received by the Underwriters in the form of electronic mail, telecopy, or express or certified mail through persons named in Item 8.(a) of the Declarations of the **Claim** or of an act, error, or omission, which could reasonably be expected to give rise to a **Claim** if provided in compliance with Clause X.B. above.

D.    The quarterly bordereau described above must be provided to the **Underwriters** via electronic mail, telecopy, or express or certified mail through persons named in Item 8.(a) of the Declarations no later than 30 June, 31 August, 30 November, 28 February respectively of the **Policy Period**;

With respect to each **Claim** noticed on a bordereau, the description of such **Claim** must include: (a) the name of the claimant(s); (b) the date an **Insured** first became aware of such **Claim**; (c) a brief summary of the facts and allegations giving rise to such **Claim**; (d) any causes of action asserted against any **Insured** (if in litigation); (e) identification of any external counsel consulted in connection with such **Claim**; (f) a reasonable estimation of the total **Claims Expenses** reasonably likely to be incurred in connection with such **Claim**; and

If requested by the Underwriters, an **Insured** must make a good faith effort to participate in a conference call no later than 15 days following the Underwriters' receipt of a quarterly bordereau to further discuss any **Claims** notified on such bordereau that involve such **Insured**.

## XI.   OPTIONAL EXTENSION PERIOD

In the event of cancellation or non-renewal of this Insurance by the **Named Insured** designated in Item 1. of the Declarations or the Underwriters, the **Named Insured** shall have the right, upon payment of the Premium set forth below in full and not proportionately or otherwise in part, to have issued an endorsement providing the corresponding **Optional Extension Period** set forth below for **Claims** first made against any **Insured** and reported to the Underwriters during the **Optional Extension Period**, and arising out of any act, error or omission committed on or after the Retroactive Date and before the end of the **Policy Period**, subject to the conditions set forth in the definition of **Optional Extension Period** herein.

| Premium: | Optional Extension Period: |
|---|---|
| 100% of the Premium set forth in Item 5. of the Declarations | 12 months |

**MARSH LTD**                                          PAGE 36 OF 58

CONTRACT NO.
QF009013 (1)

_____

150% of the Premium set forth                    24 months
in Item 5. of the Declarations

200% of the Premium set forth
in Item 5. of the Declarations                   36 months

In order for the Named Insured to invoke the **Optional Extension Period**, the payment of the additional premium for the **Optional Extension Period** must be paid to the Underwriters within thirty (30) days of the effective date of the non-renewal or cancellation.

B.    The Limit of Liability for the **Optional Extension Period** shall be part of, and not in addition to, the Limit of Liability of the Underwriters for the **Policy Period**.

C.    The quotation by the Underwriters of a different premium or Deductible or Limit of Liability or changes in policy language for the purpose of renewal shall not constitute a refusal to renew by the Underwriters.

D.    The right to the **Optional Extension Period** shall not be available to the Named Insured where cancellation or non-renewal by the Underwriters is due to non-payment of premium or failure of an **Insured** to pay such amounts in excess of the applicable Limit of Liability or within the amount of the applicable Deductible.

E.    All notices and premium payments with respect to the **Optional Extension Period** shall be directed to the Underwriters through the entity named in Item 8.(b) of the Declarations.

F.    At the commencement of the **Optional Extension Period** the entire premium shall be deemed earned, and in the event the Named Insured terminates the **Optional Extension Period** for any reason prior to its natural expiration, the Underwriters will not be liable to return any premium paid for the **Optional Extension Period**.

## XII.    REPRESENTATIONS

By acceptance of this Policy, the Chief Executive Officer, Chief Financial Officer, General Counsel and Risk Manager of the Named Insured agree that the statements contained in the **Application**, any **Application** for Insurance of which this Policy is a renewal, and any supplemental materials submitted therewith are their agreements and representations, that they shall be deemed material to the risk assumed by the Underwriters, and that this Policy is issued in reliance upon the truth thereof.

**MARSH LTD**

CONTRACT NO.
QF009013 (1)

---

XIII.   **OTHER INSURANCE**

This Insurance shall apply in excess of any other valid and collectible insurance available to any **Insured**, unless such other insurance is written only as specific excess insurance over the Limit of Liability of this Policy.

XIV.   **ASSIGNMENT**

The interest hereunder of any **Insured** is not assignable.  If the **Insured** shall die or be adjudged incompetent, such insurance shall cover the **Insured's** legal representative as the **Insured** as would be permitted by this Policy.

XV.   **CANCELLATION/NONRENEWAL**

This Policy of Insurance may not be cancelled by any **Insured** or the Underwriters, except for non-payment of premium.  If the Underwriter cancels this Policy because the Insured has failed to pay a premium when due, this Policy may be cancelled by the Underwriters by mailing or delivering a written notice of cancellation to the Named Insured stating when not less than ten (10) days thereafter such cancellation shall be effective.

XVI.   **MERGERS AND ACQUISITIONS**

A.   During the **Policy Period**, if the Named Insured or any **Subsidiary** acquires another entity whose annual revenues are more than twenty percent (20%) of the Named Insured's total annual revenues as set forth in the most recent **Application** for insurance; then no **Insured** shall have coverage under this Policy for any **Claim** that arises out of any act, error or omission, whether committed either before or after such acquisition:

1.   by the acquired entity or any person employed by the acquired entity; or

2.   involving or relating to the assets, liabilities, or **Computer Systems** of the acquired entity;

unless the Named Insured provides written notice to the Underwriters at least thirty (30) days post acquisition, obtains the written consent of the Underwriters to extend coverage to such additional entities, assets or exposures, and agrees to pay any additional premium required by the Insurer.

**MARSH LTD**  PAGE 38 OF 58

CONTRACT NO.
QF009013 (1)

___

B.    If during the **Policy Period** the Named Insured consolidates or merges with or is acquired by another entity, or sells substantially all of its assets to any other entity, then coverage under this Policy shall not apply to acts, errors or omissions committed subsequent to such consolidation, merger or acquisition and the Underwriters shall retain the total premium for this Policy, such total premium to be deemed earned at the date of such consolidation, merger or acquisition.

The foregoing provision shall not apply if the Named Insured provides written notice to the Underwriters within thirty (30) days of such consolidation, merger or acquisition, and the Named Insured has agreed to any additional premium and terms of coverage required by the Underwriters, and the Underwriters has issued an endorsement extending coverage under this Policy.

## XVII.  ASSISTANCE AND COOPERATION OF THE INSURED

The **Insured** shall cooperate with the Underwriters in all investigations, including investigations regarding the **Application** for and coverage under this Policy.  The **Insured** shall execute or cause to be executed all papers and render all assistance as is requested by the Underwriters.  The **Insured** agrees not to take any action which in any way increases the Underwriters' exposure under the Policy.

Upon the Underwriters' request, the **Insured** shall assist in making settlements, in the conduct of suits and in enforcing any right of contribution or indemnity against any person or organization who may be liable to the **Insured** because of acts, errors or omissions with respect to which insurance is afforded under this Policy; and the **Insured** shall attend hearings and trials and assist in securing and giving evidence and obtaining the attendance of witnesses.

The **Insured** shall not admit liability, make any payment, assume any obligations, incur any expense, enter into any settlement, stipulate to any judgement or award or dispose of any **Claim** without the written consent of the Underwriters, except as specifically provided for in Clause II.

Expenses incurred by the **Insured** in assisting and cooperating with the Underwriters, as described above, do not constitute **Claims Expenses** under the Policy.

## XVIII.  ACTION AGAINST THE UNDERWRITERS

No action shall lie against the Underwriters unless, as a condition precedent thereto, the **Insured** shall have fully complied with all terms of this Policy nor until the amount of the **Insured's** obligation to pay shall have been fully and finally determined either by judgment against them or by written agreement between them, the claimant and the Underwriters. Nothing contained herein shall give any person or organization any right to join the Underwriters as a party to any **Claim** against the **Insured** to determine their liability, nor shall the Underwriters be impleaded by the **Insureds** or their legal representatives in any **Claim**.

CONTRACT NO.
QF009013 (1)

---

XIX.   **SUBROGATION**

In the event of any payment under this Insurance, the Underwriters shall be subrogated to all the **Insureds'** rights of recovery therefore against any person or organization, and the **Insured** shall execute and deliver instruments and papers and do whatever else is necessary to secure such rights.  The **Insured** shall do nothing to prejudice such rights unless required to do so by written agreement before the occurrence of any act, error, omission or event that gives rise to a The **Insured** shall not prejudice those rights unless required to do so by written agreement before the occurrence of any act, error, omission or event that give rise to a **Claim** and/or **Damages, Claims Expenses, Penalties** and **Privacy Notification Costs** under this Policy.  If, as required by written agreement, the **Insured** has waived its right to subrogate against a third party through written agreement made before the occurrence of any act, error, omission or event that gives rise to a **Claim** and/or **Damages, Claims Expenses, Penalties** and **Privacy Notification Costs** under this Policy, then the Underwriters waive their rights to subrogation against such third party.  Any recoveries shall be applied first to subrogation expenses, second to **Damages, Claims Expenses, Penalties** and **Privacy Notification Costs** paid by the Underwriters, and third to the Each **Claim** Deductible or Each Incident Deductible (as applicable).  Any additional amounts recovered shall be paid to the Named Insured.

XX.   **ENTIRE AGREEMENT**

By acceptance of the Policy, all **Insureds** agree that this Policy embodies all agreements between them and the Underwriters relating to this Insurance.  Notice to any agent or knowledge possessed by any agent or by any other person shall not effect a waiver or a change in any part of this Policy or estop the Underwriters from asserting any right under the terms of this Policy; nor shall the terms of this Policy be waived or changed, except by written endorsement issued to form a part of this Policy, signed by the Underwriters.

XXI.   **VALUATION AND CURRENCY**

All premiums, limits, deductibles, **Damages** and other amounts under this Policy are expressed and payable in the currency of the United States.  If judgment is rendered, settlement is denominated or another element of **Damages** under this Policy is stated in a currency other than United States dollars or if **Claims Expenses** are paid in a currency other than United States dollars, payment under this Policy shall be made in United States dollars at the rate of exchange published in the *Wall Street Journal* on the date the judgment becomes final or payment of the settlement or other element of **Damages** is due or the date such **Claims Expenses** are paid.

XXII.   **BANKRUPTCY**

Bankruptcy or insolvency of the Named Insured shall not relieve the Underwriters of their obligations nor deprive the Underwriters of their rights or defenses under this Policy.

CONTRACT NO.
QF009013 (1)

XXIII.  **AUTHORIZATION**

By acceptance of this Policy, the **Insureds** agree that the Named Insured will act on
their behalf with respect to the giving and receiving of any notice provided for in this
Policy, the payment of premiums and the receipt of any return premiums that may
become due under this Policy, and the agreement to and acceptance of
endorsements.

XXIV.  **HEADINGS**

The descriptions in the headings and subheadings of this Policy are solely for
convenience, and form no part of the terms and conditions of coverage.

XXV.  **SERVICE OF SUIT**

It is agreed that in the event of the failure of the Underwriters to pay any amount
claimed to be due hereunder, the Underwriters at the request of any person or entity
insured hereunder will submit to the jurisdiction of any court of competent jurisdiction
within the United States and will comply with all requirements necessary to give such
court jurisdiction.   Nothing in this Clause constitutes or should be understood to
constitute a waiver of the Underwriters' rights to commence an action in any court of
competent jurisdiction in the United States, to remove an action to United States
District Court, or to seek a transfer of a case to another court as permitted by the laws
of the United States or of any state in the United States.   It is further agreed that
service of process in such suit may be made upon the firm shown under Item 10. of
the Declarations, and that in such suit instituted against any one of the Underwriters
upon this Policy, the Underwriters will abide by the final decision of such court or of
any appellate court in the event of an appeal.

The firm shown under Item 10. of the Declarations is authorized and directed to
accept service of process on behalf of the Underwriters in any such suit and/or upon
the request of any person or entity insured hereunder to give a written undertaking to
such person or entity that it will enter a general appearance upon the Underwriters'
behalf in the event such a suit shall be instituted.

Further, pursuant to the statute of any state, territory or district of the United States
which makes provision therefor, the Underwriters hereby designate the
Superintendent, Commissioner or Director of Insurance or other officers specified for
that purpose in the statute, or any of their successors in office, as their true and lawful
attorney, upon whom may be served any lawful process in any action, suit or
proceeding instituted by or on behalf of any person or entity insured hereunder or any
beneficiary hereunder arising out of this Policy, and hereby designate the firm shown
in Item 10. of the Declaration as the firm to whom the said officer is authorized to mail
such process or a true copy thereof.

## MARSH LTD

**CONTRACT NO.**
QF009013 (1)

_____

**XXVI.  CHOICE OF LAW**

Any dispute involving this Policy shall be resolved by applying the law of  the state designated in Item 11. of the Declarations .

## MARSH LTD

**CONTRACT NO.**
QF009013 (1)

---

### CANADIAN RISK ACKNOWLEDGEMENT

It is hereby understood and agreed that the Insurers hereby acknowledge that 3.8079428% of the premium for said policy is associated with the Insured's' risk and operations in Canada.

It is further hereby agreed that with respect to this 3.8079428% risk allocation to Canada, the Insurers formally acknowledge that any claims arising specifically from the Canadian operations of the insured, then the Service of Suit Clause (Canada) (Form NMA LMA5058) is applicable as to the claim action. Form NMA 5028 is attached to this endorsement as reference.

### SERVICE OF SUIT CLAUSE (CANADA)
### (Action against Insurer)

In any action to enforce the obligations of the Underwriters they can be designated or named as "Lloyd's Underwriters" and such designation shall be binding on the Underwriters as if they had each been individually named as defendant. Service of such proceedings may validly be made upon the Attorney In Fact in Canada for Lloyd's Underwriters, whose address for such service is 1155, rue Metcalfe, Suite 1540, Montreal, Quebec, H3B 2V6.

LMA5028
10/08/06
Form approved by Lloyd's Market Association

All other terms conditions and limitation remain unaltered.

**CONTRACT NO.**
QF009013 (1)

---

## EMPLOYED LAWYERS PROFESSIONAL LIABILITY INSURANCE ENDORSEMENT

(to apply to the AFB MEDIA TECH*)

In consideration of the premium charged for this Policy, it is hereby understood and agreed that:

1.  For the purpose of this Endorsement only, Item 4. **RETENTION** of the Declarations is amended to include the following:

    (a)   USD           Each **Claim** Retention - includes **Employed Lawyers Damages** and **Claims Expenses** under Insuring Clause A.1.

    (b)   USD           Each **Claim** Retention - includes **Damages** and **Claims Expenses** under Insuring Clause A.2.

2.  For the purpose of this Endorsement only, Clause **I. INSURING AGREEMENTS A**. is deleted in its entirety and replaced with the following:

    ### I.   INSURING AGREEMENTS

    A.   **Employed Lawyer** Professional Liability

         1.   Employed Lawyers Coverage

              To pay on behalf of the **Employed Lawyers Damages** and **Claims Expenses**, in excess of the Retention, which the **Employed Lawyer** shall become legally obligated to pay because of any **Claim** first made against the **Employed Lawyer** and reported in writing to the Underwriters during the **Policy Period** or **Extended Reporting Period** (if applicable) arising out of any negligent act, error or omission or **Personal Injury Act** of the **Employed Lawyer** on or after the Retroactive Date set forth in item 6. of the Declarations and before the end of the **Policy Period** committed or omitted solely in the performance of **Professional Services** except for such **Damages** or **Claims Expenses** which the Named Assured has indemnified, or is permitted or required to indemnify the **Employed Lawyer** pursuant to law, contract or the charter, bylaws, operating agreement or similar document of the **Assured Organization.**

CONTRACT NO.
QF009013 (1)

_____

    2.    Employer Indemnification

    To pay on behalf of the Named Assured **Damages** and **Claims Expenses**, in excess of the Retention, for which the Named Assured is permitted or required to indemnify an **Employed Lawyer** for sums which the **Employed Lawyer** becomes legally obligated to pay because of any **Claim** first made against the **Employed Lawyer** and reported in writing to the Underwriters during the **Policy Period** or **Extended Reporting Period** (if applicable) arising out of any negligent act, error or omission or **Personal Injury Act** of the **Employed Lawyer** on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period** committed or omitted solely in the performance of **Professional Services**.

3.    For the purpose of this Endorsement only, Clause **I. INSURING AGREEMENTS** B., C., and D, are deleted in their entirety.

4.    Clause **III. THE ASSURED AND THE ASSURED ORGANIZATION** H. is amended by the addition of the following:

    H.    An **Employed Lawyer.**

5.    For the purpose of this Endorsement only, Clause **V. EXCLUSION** P. is deleted in its entirety and replaced with the following:

    P.    By or on behalf of:

        1.    Any **Assured**, or

        2.    Any affiliate of the **Assured Organization** or the **Employed Lawyer**, or

        3.    Any partnerships or joint ventures in which the **Employed Lawyer** or any affiliate of the **Employed Lawyer** or the **Assured Organization** is a partner or member, or

        4.    Any predecessor firms, or corporations that were merged with or acquired by the **Assured Organization** or any of its affiliates or by any insurer as subrogee of any of them,

    under this Insurance against any other **Assured** or **Assureds** under this Insurance;

6.    For purpose of this Endorsement only, Clause **V. EXCLUSIONS** is amended by the addition of the following:

    -    Arising out of or resulting for any loss sustained by an **Employed Lawyer** as a beneficiary or distribute of any trust or estate;

**MARSH LTD**                                                PAGE 45 OF 58

CONTRACT NO.
QF009013 (1)

---

- Arising out of or resulting from any **Employed Lawyer's** capacity as an elected public official or as an employee of a governmental body, subdivision, or agency thereof;

- Arising out of or resulting from emotional distress or mental anguish of any person, provided this exclusion does not apply to **Personal Injury Acts**.

- For which any **Assured** has coverage under any managerial liability, directors and officers liability, general partner liability or similar insurance policy, whether or not any applicable retention, deductible or coinsurance obligation has been satisfied and regardless of whether such policy is stated to be primary, contributory, excess, contingent or otherwise;

7.  Clause **VI. DEFINITIONS** F. is amended to add the following at the end of the first paragraph;

    **Claim** also means a judicial, administrative, bar association or other proceeding against an **Employed Lawyer** solely concerning the eligibility or license of such **Employed Lawyer** to practice law.

8.  For the purpose of this Endorsement only, Clause **VI. DEFINITIONS** U. is deleted in its entirety and replaced with the following:

    **Professional Services** means only those professional legal services performed by an **Employed Lawyer** as a lawyer on behalf of the Named Assured designed in Item 1. of the Declarations while duly licensed to perform such services and includes pro bono services performed with the permission of the Named Assured designated in Item 1. of the Declarations.

9.  Clause **VI. DEFINITIONS** is amended by the addition of the following:

    "**Employed Lawyer**" means:

    1.  Any person admitted to practice law who is, was or becomes employed as a full time and salaried lawyer by the Named Assured designated in Item 1. of the Declarations, but solely for acts on behalf of the Named Assured designated in Item 1. of the Declarations

    2.  Any non-lawyer employees of the Named Assured who are, were or become assistants of an **Employed Lawyer**, while acting under the direction and control of such **Employed Lawyer** performing **Professional Services** on behalf of the Named Assured designed in Item 1. of the Declarations.

    3.  The estate, heirs, executors, administrators, assigns and legal representatives of any **Employed Lawyer** in the event of such **Employed Lawyer's** death, incapacity, insolvency or bankruptcy, but only to the extent that such **Employed lawyer** would otherwise be provided coverage under this Insurance.

**CONTRACT NO.**
QF009013 (1)

---

"**Personal Injury Act**" means:

1. false arrest, detention or imprisonment, wrongful entry or eviction or other invasion of the right of private occupancy, or malicious prosecution;

2. libel or slander or other defamatory or disparaging material, or a publication or an utterance in violation of an individual's right of privacy;

committed by the **Employed Lawyer** solely in the performance of **Professional Services.**

10. For the purpose of this Endorsement only, the Policy is amended by the addition of the follow:

**XXVI.   CHANGES IN LEGAL STAFF**

Any additional lawyers brought into or added to the in-house legal staff which takes place during the **Policy Period** must be immediately reported to Underwriters in the event that:

1. the total number of new lawyers brought onto or added to the in-house legal staff during the **Policy Period** increases the number of lawyers as stated in the application for coverage by five (5) persons or ten percent (10%) of the total number of lawyers listed in the application, whichever amount is greater: or

2. any lawyer brought into or added to the in-house legal staff during the **Policy Period** had been or was in the process of being reprimanded or censured by any court or bar association or disbarred or prohibited from practicing in a specified area of law or before any court or administrative agency; or

3. prior to joining the in-house legal staff, any **Claim** has been made against the lawyer or the lawyer had become aware of circumstances that might lead to a **Claim.**

Underwriters expressly reserve the right to demand a premium adjustment in the event that any additions to the list of lawyers in the application for this Insurance meet the criteria set forth in the paragraphs immediately above.

**CONTRACT NO.**
QF009013 (1)

---

#### XXVII. MAINTENCE OF DIRECTORS AND OFFICERS LIABILITY INSURANCE

As a condition of the availability of coverage under this endorsement, the Named Assured designated in Item 1. of the Declarations warrants that during the **Policy Period** it will maintain Directors and Officers Liability Insurance in force in an amount of at least USD ▮▮▮▮▮▮ per claim and in the aggregate.

All other terms and conditions remain unchanged

## MARSH LTD

CONTRACT NO.
QF009013 (1)

_____

### NUCLEAR INCIDENT EXCLUSION CLAUSE-LIABILITY-DIRECT (BROAD) (U.S.A.)

For attachment to insurances of the following classifications in the U.S.A., its Territories and Possessions, Puerto Rico and the Canal Zone:

> Owners, Landlords and Tenants Liability, Contractual Liability, Elevator Liability, Owners or Contractors (including railroad) Protective Liability, Manufacturers and Contractors Liability, Product Liability, Professional and Malpractice Liability, Storekeepers Liability, Garage Liability, Automobile Liability (including Massachusetts Motor Vehicle or Garage Liability),

not being insurances of the classifications to which the Nuclear Incident Exclusion Clause-Liability-Direct (Limited) applies.

This Policy* does not apply:

I.  Under any Liability Coverage, to injury, sickness, disease, death or destruction:

    (a)  with respect to which an insured under the Policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters or Nuclear Insurance Association of Canada, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

    (b)  resulting from the hazardous properties of nuclear material and with respect to which (1) any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or (2) the insured is, or had this Policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

II.  Under any Medical Payments Coverage, or under any Supplementary Payments Provision relating to immediate medical or surgical relief, to expenses incurred with respect to bodily injury, sickness, disease or death resulting from the hazardous properties of nuclear material and arising out of the operation of a nuclear facility by any person or organization.

III.  Under any Liability Coverage, to injury, sickness, disease, death or destruction resulting from the hazardous properties of nuclear material, if:

    (a)  the nuclear material (1) is at any nuclear facility owned by, or operated by or on behalf of, an insured or (2) has been discharged or dispersed therefrom;

# MARSH LTD

CONTRACT NO.
QF009013 (1)

---

    (b)    the nuclear material is contained in spent fuel or waste at any time possessed, handled, used, processed, stored, transported or disposed of by or on behalf of an insured; or

    (c)    the injury, sickness, disease, death or destruction arises out of the furnishing by an insured of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any nuclear facility, but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (c) applies only to injury to or destruction of property at such nuclear facility.

IV.    As used in this endorsement:

"hazardous properties" include radioactive, toxic or explosive properties; "nuclear material" means source material, special nuclear material or by-product material; "source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act 1954 or in any law amendatory thereof; "spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a nuclear reactor; "waste" means any waste material (1) containing by-product material and (2) resulting from the operation by any person or organization of any nuclear facility included within the definition of nuclear facility under paragraph (a) or (b) thereof; "nuclear facility" means:

    (a)    any nuclear reactor,

    (b)    any equipment or device designed or used for (1) separating the isotopes of uranium or plutonium, (2) processing or utilizing spent fuel, or (3) handling, processing or packaging waste,

    (c)    any equipment or device used for the processing, fabricating or alloying of special nuclear material if at any time the total amount of such material in the custody of the insured at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235,

    (d)    any structure, basin, excavation, premises or place prepared or used for the storage or disposal of waste,

and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations; "nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material. With respect to injury to or destruction of property, the word "injury" or "destruction" includes all forms of radioactive contamination of property.

**MARSH LTD**

**CONTRACT NO.**
QF009013 (1)

_____

It is understood and agreed that, except as specifically provided in the foregoing to the contrary, this clause is subject to the terms, exclusions, conditions and limitations of the Policy to which it is attached.

* NOTE: As respects policies which afford liability coverages and other forms of coverage in addition, the words underlined should be amended to designate the liability coverage to which this clause is to apply.


17/3/60
NMA1256

## MARSH LTD

**CONTRACT NO.**
QF009013 (1)

---

### RADIOACTIVE CONTAMINATION EXCLUSION CLAUSE-LIABILITY-DIRECT (U.S.A.)

For attachment (in addition to the appropriate Nuclear Incident Exclusion Clause-Liability-Direct) to liability insurances affording worldwide coverage.

In relation to liability arising outside the U.S.A., its Territories or Possessions, Puerto Rico or the Canal Zone, this Policy does not cover any liability of whatsoever nature directly or indirectly caused by or contributed to by or arising from ionising radiations or contamination by radioactivity from any nuclear fuel or from any nuclear waste from the combustion of nuclear fuel.

13/2/64
NMA1477

# MARSH LTD

**CONTRACT NO.**
QF009013 (1)

## WAR AND CIVIL WAR EXCLUSION CLAUSE

(Approved by Lloyd's Underwriters' Non-Marine Association)

Notwithstanding anything to the contrary contained herein this Policy does not cover Loss or Damage directly or indirectly occasioned by, happening through or in consequence of war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, military or usurped power or confiscation or nationalisation or requisition or destruction of or damage to property by or under the order of any government or public or local authority.

1/1/38

NMA464

**CONTRACT NO.**
QF009013 (1)

---

## ADDITIONAL INSURED ENDORSEMENT

This endorsement modifies insurance provided under the following:

**AFB MEDIA TECH**®

In consideration of the premium charged, it is hereby understood and agreed that **The Regents of the University of California** is added as an **Additional Insured** in accordance with Clause III.G. of the Policy, but only as respects the vicarious liability of **The Regents of the University of California** for negligent acts, errors or omissions of the **Insured Organization** otherwise covered by this Insurance.

All other terms and conditions of this Policy remain unchanged.

**MARSH LTD**                                    PAGE 54 OF 58

**CONTRACT NO.**
QF009013 (1)

## PREMIUM PAYMENT CLAUSE

The (Re)Insured undertakes that premium will be paid in full to Underwriters within 45 days of inception of this policy (or, in respect of instalment premiums, when due).

If the premium due under this policy has not been so paid to Underwriters by the 45th day from the inception of this policy (and, in respect of instalment premiums, by the date they are due) Underwriters shall have the right to cancel this policy by notifying the (Re)Insured via the broker in writing.  In the event of cancellation, premium is due to Underwriters on a pro rata basis for the period that Underwriters are on risk but the full policy premium shall be payable to Underwriters in the event of a loss or occurrence prior to the date of termination which gives rise to a valid claim under this policy.

It is agreed that Underwriters shall give not less than 15 days prior notice of cancellation to the (Re)Insured via the broker.  If premium due is paid in full to Underwriters before the notice period expires, notice of cancellation shall automatically be revoked.  If not, the policy shall automatically terminate at the end of the notice period.

Unless otherwise agreed, the Leading Underwriter (and Agreement Parties if appropriate) are authorised to exercise rights under this clause on their own behalf and on behalf of all Underwriters participating in this contract.

If any provision of this clause is found by any court or administrative body of competent jurisdiction to be invalid or unenforceable, such invalidity or unenforceability will not affect the other provisions of this clause which will remain in full force and effect.

Where the premium is to be paid through a London Market Bureau, payment to Underwriters will be deemed to occur on the day of delivery of a premium advice note to the Bureau.

11/01
LSW3000

**MARSH LTD**

**CONTRACT NO.**
QF009013 (1)

---

## INFORMATION

Proposal Form Dated.22nd March, 2013

## MARSH LTD

**CONTRACT NO.**
QF009013 (1)

---

### SECURITY DETAILS

**(RE)INSURER'S LIABILITY:**

**LMA3333**

**(Re)insurer's liability several not joint**

The liability of a (re)insurer under this contract is several and not joint with other (re)insurers party to this contract. A (re)insurer is liable only for the proportion of liability it has underwritten. A (re)insurer is not jointly liable for the proportion of liability underwritten by any other (re)insurer. Nor is a (re)insurer otherwise responsible for any liability of any other (re)insurer that may underwrite this contract.

The proportion of liability under this contract underwritten by a (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp. This is subject always to the provision concerning "signing" below.

In the case of a Lloyd's syndicate, each member of the syndicate (rather than the syndicate itself) is a (re)insurer. Each member has underwritten a proportion of the total shown for the syndicate (that total itself being the total of the proportions underwritten by all the members of the syndicate taken together). The liability of each member of the syndicate is several and not joint with other members. A member is liable only for that member's proportion. A member is not jointly liable for any other member's proportion. Nor is any member otherwise responsible for any liability of any other (re)insurer that may underwrite this contract. The business address of each member is Lloyd's, One Lime Street, London EC3M 7HA. The identity of each member of a Lloyd's syndicate and their respective proportion may be obtained by writing to Market Services, Lloyd's, at the above address.

**Proportion of liability**

Unless there is "signing" (see below), the proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together) is shown next to its stamp and is referred to as its "written line".

Where this contract permits, written lines, or certain written lines, may be adjusted ("signed"). In that case a schedule is to be appended to this contract to show the definitive proportion of liability under this contract underwritten by each (re)insurer (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of the syndicate taken together). A definitive proportion (or, in the case of a Lloyd's syndicate, the total of the proportions underwritten by all the members of a Lloyd's syndicate taken together) is referred to as a "signed line".

**MARSH LTD**                                    PAGE 57 OF 58

**CONTRACT NO.**
QF009013 (1)

The signed lines shown in the schedule will prevail over the written lines unless a proven error in calculation has occurred.

Although reference is made at various points in this clause to "this contract" in the singular, where the circumstances so require this should be read as a reference to contracts in the plural.

**ORDER HEREON:**        100%

**BASIS OF WRITTEN
LINES:**                 Percentage of Whole

**SIGNING
PROVISIONS:**            In the event that the written lines hereon exceed 100% of the order, any lines written "to stand" will be allocated in full and all other lines will be signed down in equal proportions so that the aggregate signed lines are equal to 100% of the order without further agreement of any of the underwriters.

However:

a)  in the event that the placement of the order is not completed by the commencement date of the period of insurance then all lines written by that date will be signed in full;

b)  the signed lines resulting from the application of the above provisions can be varied, before or after the commencement date of the period of insurance, by the documented agreement of the underwriters and all underwriters whose lines are to be varied.  The variation to the contracts will take effect only when all such underwriters have agreed, with the resulting variation in signed lines commencing from the date set out in that agreement.

# MARSH LTD

**CONTRACT NO.**
QF009013 (1)

---

In a co-insurance placement, following (re)insurers may, but are not obliged to, follow the premium charged by the leading (re)insurer.

(Re)insurers may not seek to guarantee for themselves terms as favourable as those which others subsequently achieve during the placement.

(Re)insurers confirm and agree that where NCAD (Notice of Cancellation at Anniversary Date) is embedded in their stamp/line this is deemed to read and mean NCED (Notice of Cancellation at Expiry Date).  This does not affect the right of the (Re)insurer to issue a Notice of Cancellation in accordance with the contract terms.

## SCHEDULE OF INSURERS:

<u>HEREON</u>:     100.0000%

| | |
|---|---|
| 82.0000% | Lloyd's Underwriter Syndicate No. 2623 AFB, LONDON |
| 18.0000% | Lloyd's Underwriter Syndicate No. 0623 AFB, LONDON |
| 100.0000% | |

_____
Authorised Signatory
for and on behalf of Marsh Ltd



Policy No:      QF009013

**Marsh Statement of Practice on Premium Taxes & other Parafiscal charges**

Whilst Marsh will endeavour to ensure that all relevant premium taxes and/or other parafiscal charges attaching to the premium are identified, the insurer and/or insured will be fully responsible for accounting for all premium related taxes. Marsh will not be responsible for advising on premium related taxes and accounting for any premium taxes or parafiscal charges on behalf of the insurer or the insured unless there is a legal requirement for Marsh to do so in a specific jurisdiction and this is agreed in advance with the insurer or insured as appropriate.

Statements concerning tax or accounting matters should be understood to be general observations based solely on Marsh's experience as insurance brokers and risk consultants and should not be relied upon as tax or accounting advice, which we are not authorised to provide. All such matters should be reviewed with the insured and/or insurer's own qualified tax, accounting and legal advisers in these areas.

**In respect of US risks and tax:-**
In the absence of a US Broker and a US insurer in the placement chain, risks located in the US will be considered as written on a "Direct Procurement" basis.  There are direct procurement taxes in certain states that may be payable by the insured locally as the insured is responsible for reporting the transaction to the state's insurance department and also remitting the direct procurement taxes to the state regulatory or tax authorities.  For placements occurring after 21 July, 2011, under the "Nonadmitted and Reinsurance Reform Act" an insured that directly obtains coverage from an insurer that is not licensed as an insurer in the state must pay a direct procurement tax in the "home state" under the policy, if direct procurement is permitted.  As "home state" rules are complex, and rates can vary depending on the "home state", an insured must seek advice from its tax advisers, as to any potential tax liability that the insured may need to remit.

Additionally, the insured may also have to remit Federal Excise Tax ("FET") to the Internal Revenue Service ("IRS") depending on the circumstances.  The general position is that FET would be payable - 4% for direct insurance on property and casualty classes and 1% on life insurance/reinsurance - on premiums payable to foreign insurers for US-domiciled risks, unless the foreign insurer is exempt by virtue of::

- U.S. double tax Treaty exemption available and the existence of a Closing Agreement between the IRS and the foreign insurer.

- Foreign insurer is subject to U.S. income tax (i.e. the foreign insurer has elected to be taxed in the U.S. on its profits - generally referred to as a section 953(d) election).

- U.S. Constitutional prohibition on taxing international transport insurance.

**Disclaimer**
**This document and any recommendations, analysis, or advice provided by Marsh (collectively, the "Marsh Analysis") are intended solely for Oracle Corporation (the "Client"). This document contains proprietary, confidential information of Marsh and may not be shared with any third party, including other insurance producers, without Marsh's prior written consent.**

**The information contained herein is based on sources we believe reliable, but we make no representation or warranty as to its accuracy. Marsh may provide to the Client information and services related to insurance regulatory and insurance tax issues concerning its insurance program. Any reports or advice provided by Marsh and any statements concerning actuarial, accounting, regulatory, legal or tax matters are based on publicly available information and Marsh's experience as an insurance broker and risk consultant in dealing with such matters for other clients and should not be relied upon as actuarial, accounting, regulatory, legal or tax advice, for which the Client should consult its own professional advisors. Any modeling, analytics, or projections are subject to inherent uncertainty, and the Marsh Analysis could be materially affected if any underlying assumptions, conditions, information, or factors are inaccurate or incomplete or should change.**

**Except as may be set forth in an agreement between the Client and Marsh, Marsh shall have no obligation to update the Marsh Analysis and shall have no liability to the Client or any other party with regard to the Marsh Analysis or to any services provided by a third party to the Client or Marsh. Marsh makes no representation or warranty concerning the application of policy wordings or the financial condition or solvency of insurers or reinsurers. Marsh makes no assurances regarding the availability, cost, or terms of insurance coverage.**