I6q1orac

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x

ORACLE CORPORATION,

                    Plaintiff,

          v.                              18 Civ. 3440 (GHW)

CHARTIS SPECIALTY INSURANCE
COMPANY,

                    Defendant.            Conference

------------------------------x

                                          New York, N.Y.
                                          June 26, 2018
                                          3:41 p.m.

Before:

                    HON. GREGORY H. WOODS,

                                          District Judge

                         APPEARANCES

McKOOL SMITH, PC
     Attorneys for Plaintiff
BY:  ADAM S. ZIFFER, ESQ.
     ROBIN COHEN, ESQ.

BRESSLER, AMERY & ROSS, P.C.
     Attorneys for Defendant
BY:  ROBERT NOVACK, ESQ.
     MICHAEL D. MARGULIES, ESQ.

I6q1orac

1                (Case called)

2                THE DEPUTY CLERK:  Counsel, please state your names

3        for the record.

4                MR. ZIFFER:  On behalf of the plaintiff, Adam Ziffer.

5                MS. COHEN:  Good afternoon, your Honor.  Robin Cohen

6        on behalf of the plaintiff.

7                THE COURT:  Thank you.  Good afternoon.

8                MR. NOVACK:  Robert Novack on behalf of the defendant.

9                MR. MARGULIES:  Michael Margulies for the defendant.

10               THE COURT:  Good.  Thank you very much.  Good

11       afternoon.

12               So we're here for an initial pretrial conference with

13       respect to this case.  My agenda for the conference follows:

14               First, I'm going to give each of the parties the

15       opportunity to describe any legal or factual issues that you'd

16       like to bring to my attention in connection with the case.

17       We've already discussed the case, and I've reviewed the

18       materials that have been submitted on the docket to date, with

19       the exception of the answer.  Still, I look forward to hearing

20       from you with respect to any issues that you'd like to

21       highlight for me during this conference.

22               Second, I hope to discuss the process that we'll be

23       using to litigate the case going forward.  For that purpose, I

24       expect to look to the proposed case management plan and

25       scheduling order that the parties have submitted as the

I6q1orac

1  framework for that conversation.

2          And last, I hope to discuss what I can do to help the

3  parties facilitate a resolution of the case, in particular the

4  prospect of a reference to the assigned magistrate judge as

5  soon as practicable.

6          Good.  So that's my agenda.  Is there anything that

7  either set of parties would like to add to that agenda before

8  we proceed?

9          MR. ZIFFER:  Not from the plaintiffs, your Honor.

10          THE COURT:  Thank you.

11          Counsel?

12          MR. NOVACK:  No, your Honor.

13          THE COURT:  Good.  Thank you.

14          Counsel for plaintiff, what would you like to tell me

15  about the case?

16          MR. ZIFFER:  Well, briefly, your Honor, this is a case

17  where Oracle is seeking insurance coverage under an insurance

18  policy that was written to cover allegations that in the course

19  of its provision of professional services, there were errors or

20  omissions.  Oracle was contracted with the State of Oregon to

21  put together their health information exchange, the Obamacare

22  equivalent but at the state level, and they worked on a project

23  for a number of years and then, for a variety of reasons, it

24  blew up as it was approaching launch.  There was some

25  significant discourse between state and Oracle with respect to

I6q1orac

how to manage the deterioration of the relationship, and at

some point during that process, a tolling agreement was

exchanged and Oracle put its insurance company -- there was a

tower of insurance -- on notice of a potential claim at that

time.  Ultimately the state of Oregon issued a civil

investigation demand, Oracle continued to try to settle its

dispute with the state of Oregon, but at some point in time I

believe it was the Oregon attorney general made a speech and

informed the public that it was being directed by the governor

to sue Oracle on the contract.

          In an effort to defend against the ripening claim,

Oracle filed the lawsuit to try to secure a federal forum.  It

sued for breach of contract and I think eventually also for

copyright infringement in federal court.  It was the equivalent

of an effort to plant the flag in a federal case where it

thought it would get a better shot than in Oregon state court.

          Less than two weeks later, the state of Oregon filed

what we refer to as the main case in Oregon state court against

Oracle and brought a number of causes of action, about 13.  I'm

not going to go into them in detail because we discussed them

with your Honor previously during the premotion conference,

claims ranging from breach of contract to fraud and RICO.

There were another five lawsuits that were filed that we refer

to in our complaint, and the five lawsuits, I think one was

brought by the state of Oregon for an injunction, four others

I6q1orac

1    were brought by Oracle.  This was a massive litigation that was

2    focused on the state of Oregon's claim for approximately

3    $7 billion for the failure of the healthcare system that Oracle

4    designed for the state of Oregon.

5            Eventually these cases settled.  And they all settled

6    at once.  There was a significant negotiation, and I also won't

7    go into what we've discussed previously about the carrier's

8    appraisement or involvement in the details of the settlement

9    and the facts leading up to it.  What we're here about are the

10   costs of defense fees, which were in the range of ██ to

11   $██ ██████.  There were a number of firms.  All of the

12   invoices in negotiations had been provided to the defendant

13   here.  And there is also $35 million that is the value of the

14   settlement.  25 million was paid for Oregon's legal fees and

15   $10 million was paid by Oregon for stem funding.

16           So what happened was, there's a $██████████

17   self-insured retention or deductible.  So the first ██████████

18   of the over $██████████ in loss goes there.  Then comes

19   Beazley, which is an insurance company, the primary insurance

20   company, and its policy limit was for $██████████.  There was

21   some exchange between Oracle and Beazley, and ultimately

22   Beazley paid its $██████████ in full.

23           Next up is the defendant here that I'll refer to as

24   AIG.  The Oracle looked to AIG to pay.  There were over the

25   limits still remaining in the amounts that Oracle paid to its

I6q1orac

1   lawyers, claims expenses, as that's defined under the policy,

2   in addition to the $35 million of the indemnity spend or the

3   settlement amount.  The position that AIG took was that it was

4   not going to acknowledge that there was coverage for a couple

5   of components of the claims expenses.  One of those components

6   was the amount that was spent in the main case to defend the

7   Oregon False Claims Act, and I believe it's going to be a

8   motion for judgment on the pleadings.  We've looked at that,

9   and we anticipate it's going to take that form.

10          Additionally, AIG took the position that the funds

11   that Oracle spent in pursuing the affirmative lawsuits -- the

12   federal court action, there was another action against some

13   political supporters of the governor who they alleged had an

14   agenda to blow up the contract with Oracle, there was another

15   litigation that Oregon filed against the governor to produce

16   documents that were going to be used in connection with its

17   defense of the underlying claim, and there was also a writ of

18   mandamus that Oracle filed in DC federal court to try to upend

19   the Oregon state proceeding.  So AIG has taken the position

20   that its policy does not cover amounts that were spent in

21   pursuit of these affirmative claims.

22          THE COURT:  I'm sorry.  This is not core to the issues

23   that are presented here, but what was the basis for the

24   mandamus action?

25          MR. ZIFFER:  I believe the position that Oracle took

I6q1orac

1    was that the state lacked standing to attack the contract or

2    the damages.  I'm not sure the details of it.

3              THE COURT:  That's fine.  Please proceed.

4              MR. ZIFFER:  Sure.  But it was part of a concerted and

5    coordinated defensive effort.

6              So our position is that the language of the policies

7    in the insuring agreement which says that this policy covers

8    claims expenses which the insured -- that's Oracle -- is

9    legally obligated to pay because of any claim, and when we

10   eventually approach your Honor or the jury with the question of

11   whether or not all of its claims expenses are covered, we'll

12   focus on that language, that even the affirmative suits, the

13   claims expenses incurred in connection with them were because

14   of the claim against Oracle.  In addition, the definition --

15             THE COURT:  Sorry.  You say "because of."  The

16   language that you just read said "legally obligated to pay

17   because of."  What's the basis of the contention that Oracle is

18   legally obligated to take on those claims?

19             MR. ZIFFER:  Claims expenses.  No different than any

20   other claim expense, that essentially you contract with lawyers

21   to defend a claim, and that generates the legal obligation to

22   pay those claims.  AIG has not taken the position that there's

23   no legal obligation with respect to the claims expenses but

24   rather that those claims expenses were not in defense of a

25   claim, and that is language that appears elsewhere in the

I6q1orac

1  policy.  To counter their position that the claims expenses

2  incurred in connection with the affirmative suits were not in

3  defense of a claim, we'll point to this language that says that

4  claims expenses are covered if they are because of any claim.

5  And that's in the insuring agreement.

6         THE COURT:  Thank you.

7         And the words are "because of any claim," "not legally

8  obligated to pay because of any claim"?

9         MR. ZIFFER:  I'll read it in total.  That they agree,

10  and now I'm quoting, "to pay on behalf of any insured damages

11  and claims expenses in excess of each claimed deductible, which

12  the insured shall become legally obligated to pay because of

13  any claim."

14         And Oracle will show how the words "because of any

15  claim" in that phrase are broader than only those claims

16  expenses that they would be legally obligated to pay in defense

17  of a claim.

18         In addition --

19         THE COURT:  I'm sorry.  Let me just take a step back.

20         MR. ZIFFER:  Sure.

21         THE COURT:  The "legally obligated" in your view

22  refers specifically to the contractual obligation between

23  Oracle and its counsel; it's not a reference to whether or not

24  this is a mandatory counterclaim or something that they're

25  legally obligated to pursue in connection with the litigation?

I6q1orac

1          MR. ZIFFER:  That's correct.  Typically the words

2     "legally obligated" are focused on in the context of damages,

3     and often the litigation around that language in an insurance

4     policy has to do with whether or not there really was liability

5     for a particular claim.  I haven't seen it litigated in the

6     context of the claims expenses, and again, it's not something

7     that AIG has raised, the phrase "legally obligated" is a basis

8     to avoid the claims expenses.

9          THE COURT:  Thank you for the education.  Please

10    proceed.

11         MR. ZIFFER:  In addition, the definition of "claims

12    expenses" has a number of components to it, and one of them is

13    particularly expansive.  Sorry, your Honor.  I'm looking for

14    it.

15         So "claims expenses" means, and definition 2 is "all

16    other fees, costs, and expenses resulting from the

17    investigation, adjustment, defense, and appeal of a claim,

18    suit, or proceeding arising in connection therewith."  So we

19    will rely on that expansive definition of "claims expenses" to

20    further support the proposition that the claims expenses

21    incurred in connection with the affirmative claims are covered.

22         THE COURT:  Thank you.  And with reference to the

23    "arising in connection therewith" language, which you argue is

24    broader.

25         MR. ZIFFER:  Than just in defense of a claim.  Yes.

I6q1orac

1          THE COURT:  Understood.

2          Anything else that you'd like to tell me?

3          MR. ZIFFER:  Only the point that to the extent that

4     the $35 million settlement value is covered, we exhaust the

5     limits of the AIG policy ████████, without getting into the

6     question of whether or not portions of the defense costs are

7     covered, and with respect to that question, of course this

8     policy follows form to the Beazley policy, the primary policy

9     that paid its full limits.  And to the extent that I didn't

10    mention it, and I don't think I did, what I was quoting from

11    was actually the primary Beazley policy to which the AIG policy

12    follows form.  That's what the case is about.

13          You know, the consent to settle issue we've discussed

14    before.  This allocation point will be the other one.  Counsel

15    and I have -- our firms and us individually have had a number

16    of cases together, so I anticipate that we're going to really

17    be able to focus in on these issues in dispute and do it in an

18    efficient way, as we've done historically.

19          THE COURT:  Good.  Thank you.  I appreciate that.

20          Counsel for defendant.

21          MR. NOVACK:  Good afternoon, your Honor.

22          I think Mr. Ziffer gave a fairly good description of

23    what the case is about.

24          I guess the three main issues here are whether or not

25    these affirmative claims are covered at all under the primary

I6q1orac

 1    policy.  The language your Honor has pointed to, as well as

 2    other language in the policy, in our view, and based upon many

 3    authorities, which I'm sure we'll bring to your attention at

 4    the appropriate time, that these insurance policies do not

 5    cover affirmative claims and that the language of the policy

 6    does not support what they've indicated here.  There are a

 7    number of underlying claims that are based upon fraud or other

 8    intentional misconduct which we believe are not covered.  This

 9    is a professional liability policy.  The language of the

10    insuring clause talks about negligent acts or unintentional

11    acts.  It's not intended to cover intentional fraud or claims

12    of that sort.

13         The issue with respect to the indemnity claim, which

14    we believe was waived by not seeking consent of the insured

15    prior to making a settlement arrangement with the plaintiffs, I

16    think probably as we indicated in our conference call with the

17    Court, will likely resolve as a matter of law whether or not

18    the indemnity claim is even covered.  If the indemnity claim is

19    covered, the case will have a different complexion, and I think

20    that's one of the reasons both sides would like to get it

21    resolved early on.

22         With respect to the defense costs, while there were

23    approximately ████████ or $████████ in fees, we're still

24    looking at invoices, quite a bit of them, quite a few of them.

25    One of AIG's contentions has been that Beazley, who was the

I6q1orac

1    underlying primary carrier, was going to exhaust its limits

2    regardless of whether or not affirmative claims were covered,

3    fees of law firms for affirmative claims were covered, was

4    going to exhaust its limits with respect to defense costs, even

5    if you were to cut this $██████ of fees in half.  Our

6    position is that our policy limits will not be triggered or

7    reached because many of the claims with respect to defense

8    costs are not covered at all in the first instance, and even if

9    they were covered, we believe we would be able to establish

10   that the fees are, on their face, either not covered because of

11   the nature of the claims or because of the failure to cooperate

12   with the insurers to keep accurate and appropriate records with

13   respect to where monies were spent.  I don't want to get too

14   deep into the weeds, but there are -- I think it's

15   approximately $██████ in fees.  Much of it is block billing

16   with no indication on which of the seven or eight matters they

17   were handling they were billing time to.  Issues like that,

18   which are likely to be the subject of expert testimony at some

19   point.

20            So I think the initial applications that both sides

21   would bring, which the Court asked us to bring to your

22   attention, probably will go a long way to resolving perhaps the

23   case as a whole or narrowing the issues.

24            THE COURT:  Thank you.  Good.

25            So counsel for plaintiff, can I hear from you

I6q1orac

1   regarding what you anticipate doing with respect to fact and

2   expert discovery in the case.  I want to hear both about the

3   substantive issues that you expect to elucidate through

4   discovery and also to get some sense of the scope of discovery

5   that you anticipate taking.

6             MR. ZIFFER:  Sure.

7             Substantively, the substantive areas, we're going to

8   want to talk with the claims handler at AIG and/or the

9   underwriter about their understanding of some of the policy

10  language that I've mentioned and also that counsel has

11  mentioned.  We got their answer yesterday, I believe, and there

12  are, I don't know, maybe ten or so exclusions, most of which we

13  think facially don't apply.  So we'd spend some time with a

14  corporate representative working through whether there's any

15  factual support or what the theory is as to why they apply.

16  And those may go away.  I hope and expect that they will.

17            We're going to want to do some more significant

18  drill-down on the questions surrounding the information that

19  was provided during the time of settlement, both before and

20  after, to understand both from the insurance company's side

21  what information they were provided and what kind of decisions

22  they were making and what kind of engagement they were

23  anticipating, and in that regard, we also may want to take some

24  limited third-party discovery, because the insurance broker --

25  here I believe it was Marsh McLennan -- was working as a

I6q1orac

conduit of information between Oracle on the one hand and the

insurance companies on the other hand.  So that broker will

also have information about -- or will have discovery about the

information that was provided from Oracle to the insurance

companies with respect to the settlement.

Factual discovery, I think that's it, that I can

perceive from right now.  If one of the exclusions -- I looked

at them today.  I really don't think that other than what we've

mentioned today, these other exclusions are going to present an

issue.  If something did, we would deal with it.  But we think

discovery is going to be pretty focused.

Should I comment on expert discovery as well?

THE COURT:  Please do.

MR. ZIFFER:  Sometimes we find it appropriate to get

an expert to weigh in on policy language if we think it's

ambiguous or if we think we may be saying the same thing,

reasonable differing interpretations thereof.  So that's

something that we would explore as the case matures.

And then in addition, I heard counsel mention experts

about the fees.  In some of these cases where the billings and

the reasonableness of the billings are called into question,

sometimes policyholders will have an expert who can be of real

assistance to a fact finder where you have $▓▓▓▓▓▓▓ in

detailed invoices, which can be substantial to work through

them and talk through the nature of law firm billing on a

I6q1orac

1    summary basis and to contest challenges of reasonableness, to

2    the extent that they're made.

3         THE COURT:  Good.  Thank you.

4         Counsel for defendant, I have the same questions for

5    you.

6         MR. NOVACK:  So again, I think Mr. Ziffer has a fair

7    appraisal of what's ahead.  I probably take issue with the idea

8    that an underwriter's testimony might be necessary, unless

9    they're alleging that the policy is ambiguous.  I think New

10   York or even California law, which I think governs here, absent

11   an ambiguity in the policy, I think it's for the Court to

12   determine whether that facts apply with the policy.  But I

13   think that's something we'll probably develop as we get further

14   along, whether they're making that allegation, and I would say

15   in roughly 25 percent of our cases do we need an expert to tell

16   us what the policy is intended to say.

17        So with respect to a claims handler, that's a common

18   deposition.  We're not going to object to it.  We also would

19   likely take the depositions of the people in risk management at

20   Oracle or I think in their general counsel's office, whoever

21   the responsible party was who was communicating what was

22   happening in the underlying cases.  We've just become familiar

23   with the claims file recently, your Honor, so I can't give you

24   names or titles at this point.

25        We also, in this particular case, I think would likely

I6q1orac

1   share in the view that the broker who acts as an advocate for

2   Oracle in its communications with the insurer would likely be a

3   fact witness as well.  But I'm thinking hopefully something

4   less than a half dozen depositions, perhaps, on each side;

5   hopefully not more than that.

6          With respect to experts, our common practice where we

7   get $███████ in bills dropped on us -- remember we're an

8   excess carrier and a lot of things came to us at the end -- we

9   typically have an expert familiar with the locale where these

10  cases were litigated to give us some advice or opinions with

11  respect to the reasonableness of fees and the types of work

12  that they were doing, and to assist us in trying to allocate

13  the $███████ or so in fees among the various underlying

14  actions, which all relate to whether or not they're covered in

15  the first place, in our view.

16         So I don't think this is a terribly complicated case

17  from the insurer's perspective, and at least at this juncture,

18  hopefully, working cooperatively.  I think the only difficult

19  thing for both sides is neither of us know the extent of ESI at

20  this early stage, and that sometimes is something that slows us

21  down a bit, but with respect to scheduling deps and things like

22  that, generally we don't have problems doing that.

23         THE COURT:  Thank you.

24         With respect to ESI, have the parties conferred yet

25  about custodians and potential search terms?

I6q1orac

1            MR. ZIFFER:  We have not, your Honor.

2            THE COURT:  Thank you.  I'll encourage you to do that

3       promptly.  For reasons that counsel just articulated.

4            First, I appreciate the fact that the parties have

5       thought carefully about the nature and scope of the discovery

6       that you expect to take.  I've reviewed the parties' proposed

7       case management plan and scheduling order, and based on your

8       proffers, I think that the deadlines that you proposed are

9       reasonable.  I'd like to suggest a few modifications to the

10      order, however.

11           First, in paragraph 7A of the case management plan,

12      the parties have suggested that the deadline for service of

13      requests to admit be September 18, 2018.  I'd like to propose

14      that we move that to September 14, 2018.  The date that's

15      proposed is somewhat shorter than the 30 days permitted for

16      production of responses to requests to admit.  I'd like to make

17      sure that you have the opportunity to receive those responses

18      prior to the close of fact discovery.  Is that an acceptable

19      modification for plaintiff?

20           MR. ZIFFER:  Yes.

21           THE COURT:  Thank you.

22           Counsel?

23           MR. NOVACK:  Yes, your Honor.

24           THE COURT:  Good.  Thank you.

25           The second issue that I'd like to discuss is in

I6q1orac

1    paragraph 8C of the case management plan.  Here, the deadline

2    for expert discovery is stated in paragraph 8B.  It's stated

3    there to be November 30, 2018.  The deadline for party opponent

4    disclosures in paragraph 8C, however, is the same date, so I'd

5    like to suggest that the deadlines in paragraph 8C be modified

6    to be October 16 and October 30, 2018, respectively.  It may be

7    that that's a typographical error.

8              What's your position on those proposed changes?

9              MR. ZIFFER:  It was a typographical error.  The only

10   question -- and we discussed this -- is whether we wanted a

11   little bit of a gap between the close of fact discovery and the

12   start of expert discovery, to give the experts maybe some room

13   to work with at the very end, so we had discussed November 1

14   and November 16.

15             THE COURT:  Thank you.

16             Counsel for defendant, is that acceptable to you?

17             MR. NOVACK:  Yes.  That's what we had discussed before

18   we came in, your Honor.

19             THE COURT:  Good.  Thank you.

20             Given a November 16 deadline for production of party

21   opponent expert disclosures, 14 days for completion of expert

22   discovery seems short.  Would you like to propose a

23   modification to the deadline in paragraph 8B?

24             MR. ZIFFER:  Sure, your Honor.  I think three weeks

25   for expert depositions.  The problem is usually the scheduling,

I6q1orac

not the doing.  Maybe just -- see, I don't want to move the
summary judgment date out.  Can we try to get it done in two
weeks?

MR. NOVACK:  We'll undoubtedly have an expert issue
because they're difficult, but yeah, we can try it.

MR. ZIFFER:  Your Honor, I guess we'd ambitiously try
to keep the dates.

THE COURT:  Fine.  Understood.

So I'll keep the end date for expert discovery at
November 30th.  I'll modify the deadlines in paragraph 8C to
refer to November 1st and November 16th respectively.

I understand that the parties wish to keep the
deadline in paragraph 10 for summary judgment motion, which is
December 19, 2018.  Let me remind you that my rules require the
submission of a premotion conference letter prior to submission
of the motions for summary judgment.  I'll tell you that my
usual practice is to schedule the deadline for submission of
the motion itself after reviewing that letter such that
frequently, the deadline that's contained in paragraph 10 of
the case management plan becomes more notional than absolute.
That said, if the parties wish to meet that deadline, which has
many benefits, I just encourage you to write me promptly with
your premotion conference letter so that we can talk about the
motion if necessary and so that the parties have no issues
meeting the December 19 deadline, but you should be aware that

I6q1orac

1   if during the course of that premotion conference it appears

2   that the parties need more time to file the summary judgment

3   motion, I will frequently entertain that request.

4          Good.  I think that is all of the matters that I

5   wanted to discuss in the case management plan itself.  Let me

6   just say a few words about the deadlines here.

7          I'm sorry.  Counsel?  Please.

8          MR. NOVACK:  Taking a second look at 8B, maybe

9   December 7th for the expert discovery completion, just a week.

10  Only because experts are difficult to schedule typically, so

11  instead of having 14 days, I would prefer, unless you have --

12         THE COURT:  Thank you.

13         Counsel?

14         MR. ZIFFER:  No objection.

15         THE COURT:  Thank you.  I'll modify paragraph 8B as

16  suggested so that expert discovery will be completed by

17  December 7th.

18         Do the parties wish to retain the December 19 summary

19  judgment motion deadline?

20         MR. ZIFFER:  Yes, we would.

21         THE COURT:  Thank you.

22         Counsel for defendant?

23         MR. NOVACK:  That's fine, your Honor.

24         THE COURT:  Thank you.  Good.

25         So just a few words about the case management plan as

I6q1orac

1    a whole.

2              First, let me just highlight the fact that the

3    deadlines here are real deadlines.  Deadlines for completion of

4    fact and expert discovery are deadlines for completion of fact

5    and expert discovery.  In other words, I expect that there will

6    be no more discovery of the relevant type after those dates.

7    There are a number of corollaries that flow from that rule.

8    First, if you are unable to resolve a discovery dispute amongst

9    yourselves, please don't hoard it until late in the discovery

10   process or afterwards.  You should not expect that I'll add

11   some indefinite amount of time to litigate discovery disputes

12   following the close of fact discovery.  Instead, you should

13   bring me a dispute early enough so that I can resolve it and

14   you can get the responsive materials by the close of fact

15   discovery.  So the close of fact discovery is not the close of

16   fact discovery and the commencement of fact discovery

17   litigation.  It's the close of fact discovery.

18             Similarly, be mindful that as you're scheduling the

19   conduct of discovery, that if you wait until late in the

20   discovery process to request or take discovery, it will leave

21   you with limited time for follow-up discovery.  So for example,

22   if you were to wait until October 16th to take a deposition,

23   you would have no time left for any follow-up discovery with

24   respect to any information that you might learn during the

25   course of that deposition.  So you are at liberty to schedule

I6q1orac

1    depositions up to that date in the case management plan.  That

2    said, there are ultimate constraints -- namely, the deadlines

3    for completion of fact discovery and, with respect to experts,

4    expert discovery.

5         With respect to expert discovery, we have already

6    talked about the deadlines in paragraph 8C.  I just want to

7    emphasize the deadline for disclosures under that paragraph.

8    If you fail to provide all of the disclosures required under

9    the rule for any expert by the date specified, you should not

10   expect that your expert will be permitted to provide testimony

11   or other evidence in the case.  Now remember that the

12   disclosures rules under 26(a)(2) apply both to report-giving

13   and nonreport-giving experts.  So please don't think that you

14   need not provide disclosures for an expert who is not required

15   to provide a report.  The disclosures requirements are

16   different for such an expert but not nonexistent.  So please

17   comply with all of these deadlines.

18        I'll grant extensions of time but only for good cause

19   shown.  I'll scrutinize requests for existence of good cause.

20   And you should also make any requests for an extension within

21   the two days prior to the date sought to be extended.  If you

22   fail to do that, you should expect that I'll deny the request.

23        Good.  So what can I do to help you resolve the case

24   at this point?

25        MR. ZIFFER:  Before we get to that, your Honor, I

I6q1orac

1    wanted to identify one other scheduling issue.

2              THE COURT:  Please do.  Oh, is this the motion?

3              MR. ZIFFER:  Yes.

4              THE COURT:  Thank you.  Yes.  I saw that in your

5    letter.

6              I understand that defendant seeks an extension to the

7    19th of July to accommodate preplanned vacations.  Counsel for

8    plaintiff?

9              MR. ZIFFER:  Yes, no objection.  That way the motions

10   track at the same time, which is convenient for us.

11             THE COURT:  Thank you.

12             I'd be happy to grant that request and will modify my

13   order to permit defendant to submit its motion on the 19th of

14   July.  Good.

15             So what can I do to help the parties resolve the case

16   early?  Counsel for plaintiff?

17             MR. ZIFFER:  Well, your Honor, I do think that

18   decisions on the motions that are contemplated will be helpful,

19   as defense counsel pointed out.  I also think that a reference

20   to the magistrate, getting a third party involved would be

21   helpful as well.  It may make sense to schedule us with the

22   magistrate after those motions are decided.  I do think that

23   clarity on at least the two issues that we're talking about

24   briefing would go a long way towards focusing the parties on

25   the case.  Frankly, I think the indemnity costs will be in, so

I6q1orac

1   the slicing up of the defense costs will be less significant

2   and there will be lots of ways for us to get through the full

3   $█████████, and once that has been confirmed, I think we'll be

4   able to be productive in that regard, and also, when we

5   establish coverage for, you know, half of the claims in the

6   main action, that would be productive as well.

7              Can I confer with my colleague for one second, your

8   Honor.

9              THE COURT:  Please do.

10             MR. ZIFFER:  Thank you, your Honor.

11             So in terms of timing, I think that we would be

12  optimally situated after that time period, after the decisions.

13             THE COURT:  Thank you.

14             Is it plaintiff's position that it would not be

15  appropriate for me to enter a reference until after those

16  motions have been decided?

17             MR. ZIFFER:  I think that would be optimal.

18             THE COURT:  Thank you.

19             Counsel for defendant, what's your view?

20             MR. NOVACK:  Well, I guess we've reached our first

21  disagreement, probably.  My sense is that we need to brief

22  these issues because it would be helpful to each of our

23  respective clients, but I think it is likely, depending upon

24  the outcome of the motion, we won't need a settlement

25  conference, because it could dispose of a substantial portion

```
 1    of the case one way or the other.  So my thinking would be to

 2    brief it and, if the magistrate were available, perhaps have a

 3    conference while the motion was pending.

 4              THE COURT:  Thank you.  Good.

 5              Counsel for plaintiff, is that acceptable to you?

 6              MR. ZIFFER:  I think it will be unproductive.  I think

 7    that -- we have a gap between ██ and ██ right now, and that's

 8    what we're going to have, although I think each side has strong

 9    views about where they are.  That was reflected in the

10    premotion conference.  So I'm always happy to sit in a room,

11    but I think if we're going to make an effort and take the

12    magistrate's time, that that's not the optimal time.

13              THE COURT:  Thank you.

14              Let me do this.  I'll enter a reference to the

15    assigned magistrate judge.  There's benefit of having the

16    reference in place in any event so that you can schedule

17    something promptly.  I'll let you discuss with the magistrate

18    judge regarding whether or not you believe it would be fertile

19    for you to take up the conference with him while the motion

20    itself is pending.  I ask no more than that you be willing to

21    engage in a conversation about the prospect of settlement.  My

22    view of the mediation is not that you expect that you will

23    necessarily agree but simply that you go in with an open mind,

24    with an eye toward the possibility of agreeing, and I think

25    that you can do that even after the motions have been briefed
```

I6qlorac

1    and before the Court's decided.  You'll have a clearer view of

2    the merit of your adversary's arguments even without the

3    benefit of my decision.  So I'll encourage you to take up

4    defendant's proposal and will enter a reference and let the

5    magistrate judge know that that's my suggestion regarding

6    timing of the proposed conference.

7              Anything else that we should discuss here?  Counsel

8    for plaintiff?

9              MR. ZIFFER:  Not from the plaintiff.

10             THE COURT:  Good.  Thank you.

11             Counsel for defendant?

12             MR. NOVACK:  No, your Honor.

13             THE COURT:  Good.  Thank you, all.  This proceeding is

14   adjourned.

15             THE DEPUTY CLERK:  All rise.

16                              o0o

17

18

19

20

21

22

23

24

25