# HIRSCHORN DECLARATION
# EXHIBIT 1



Clyde & Co US LLP
101 Second Street
24th Floor
San Francisco, California 94105
Telephone: (415) 365-9800
Facsimile: (415) 365-9801
www.clydeco.us
Joan N. D'Ambrosio
joan.dambrosio@clydeco.us

June 16, 2015

*VIA E-MAIL: deborah.miller@oracle.com*

Deborah Miller, Esq.
Oracle Corporation
500 Oracle Parkway
M/S 5 op7
Redwood City, CA 94070

Re: **Insured:** **Oracle Corporation**
     **Claimant:** **Cover Oregon**
     **Policy No.:** **QF009013**
     **Policy Period:** **March 31, 2013 to March 31, 2014**
     **Beazley Ref. No.:** **BEAZL10000281609**

Dear Ms. Miller:

On behalf of Certain Underwriters at Lloyd's ("Underwriters"), Syndicates 623 and 2623 ("Beazley"), subscribing to Policy no. QF009013 issued to Oracle Corporation ("Oracle") for the period March 31, 2013 to March 31, 2014 (the "Policy"), this letter follows our prior correspondence and numerous discussions regarding this matter.

Beazley has reviewed all of the information presented and we write to advise that, based upon currently available information, there are significant limitations to coverage under the Policy. As described in greater detail below, coverage under the Policy potentially is implicated by the breach of contract claims (counts ten to twelve), but is precluded for the remaining counts: fraud (counts one to two); violation of Oregon False Claims Act ("FCA") (counts three to nine); and Oregon Civil Racketeer Influence and Corrupt Organizations Act ("RICO") (counts thirteen and fourteen).

Beazley understands that Oracle's defense counsel also is representing Oracle in connection with its affirmative claims. The Policy does not provide coverage for the prosecution of affirmative claims, so any costs or fees associated with the prosecution of Oracle's claims against Cover Oregon and the Governor of Oregon's former advisors, as well as Oracle's counterclaim, do not fall within the scope of coverage under the Policy. Beazley understands Oracle has instructed counsel to maintain separate files and segregate the non-defensive fees from the defense fees.

Clyde & Co US LLP is a Delaware limited liability partnership with offices in Atlanta, New Jersey, New York, Newport Beach and San Francisco.
Clyde & Co US LLP is affiliated with Clyde & Co LLP, a limited liability partnership registered in England and Wales.

1620929



Deborah Miller, Esq.
Oracle Corporation
June 16, 2015
Page 2

As you know, the Policy requires allocation between covered and non-covered costs, expenses and losses.

Given the noncovered claims, Beazley further requests that Oracle tender this claim to its other insurers if it has not yet done so, so that Oracle can maximize other coverage it may have available.

The positions outlined in this letter are based upon the allegations in the complaint, publicly available information regarding the dispute, and other information Oracle has provided to date. As always, we would be pleased to discuss this letter with you and to forward to Beazley any additional points Oracle believes are relevant.

## SUMMARY OF CLAIM

By way of background, Beazley summarizes its understanding of this matter. Beazley emphasizes that it does not assume that any of these allegations have any merit whatsoever, and it specifically takes no position with respect to their veracity.

On August 22, 2014, Cover Oregon, the State of Oregon (the "State"), and the Oregon Attorney General (together, the "plaintiffs") filed a lawsuit in the Marion County, Oregon Circuit Court against Oracle, Mythics, Inc. and six current and former employees of Oracle.

The plaintiffs allege Oracle fraudulently induced the State and Cover Oregon to enter into contracts for the purchase of Oracle products and services that failed to perform as promised. Compl. ¶ 1. According to the complaint, Oracle proposed the "Oracle Solution for Oregon" to build the State's health insurance exchange and to modernize its aging social services computer systems. *Id.* at ¶¶ 2, 35. The technological foundation for the "Oracle Solution" consisted of two software programs: Siebel Public Sector ("Siebel") and Oracle Policy Automation ("OPA"). *Id.* at ¶¶ 51-52. The plaintiffs allege that statements by Oracle that these products would work "out-of-the-box" with only 5% of the business requirements requiring customization were not accurate. *Id.* at ¶¶ 3, 74. The plaintiffs also allege Oracle falsely represented that the "Oracle Solution" was flexible, integrated, configurable, and worked easily with other programs. *Id.* at ¶¶ 3, 12, 70, 76. The plaintiffs further allege Oracle falsely stated that the "Oracle Solution" would allow the State to meet the demanding timelines imposed by the ACA, and that in a March 14, 2011 presentation Oracle stated that "Infrastructure and Environment can be stood up in less than 3 weeks from contract ratification." *Id.* at ¶¶ 3, 65.

In furtherance of the projects, the State alleges that Oracle entered into the following agreements which provided the contractual framework for the purchase of Oracle's products and services through separate purchase orders: (1) on June 30, 2011, Oracle entered into a License and Services Agreement with Mythics ("Mythics Agreement") (*id.* at ¶ 82); (2) on November 30, 2011, Oracle entered into an Oracle License and Services Agreement directly with the State ("State Agreement") (*id.* at ¶ 92); and (3) on or about March 14, 2013, Cover



Oregon and Oracle entered into an Oracle License and Services Agreement ("Cover Oregon Agreement," collectively, the "Agreements") (*id.* at ¶ 110). Under these Agreements, the parties executed millions of dollars of purchase orders for Oracle's hardware, software and consulting services.

The plaintiffs allege Oracle breached the contracts by failing to deliver on its obligations, overcharging, concealing its shoddy performance, promising what it could not deliver, and willfully refusing to honor its warranty to fix errors without charge. *Id.* at ¶ 1. The plaintiffs allege Oracle failed to meet industry standards for architecture, planning, development, implementation, integration, customization, configuration, project management and productivity. *Id.* at ¶ 156. Oracle allegedly deceived the State throughout 2013 and early 2014 about the development status of the health insurance exchange. *Id.* at ¶ 125. The State's health insurance exchange was not ready for public launch by the October 1, 2013 deadline, or even by April 2014. *Id.* at ¶ 8. The State alleges it was forced to hire hundreds of additional employees to manually enroll Oregonians in health insurance by hand processing paper applications. *Id.* at ¶¶ 9, 139. Realizing Oracle would never live up to its obligations, Cover Oregon began work to transition to the federally run system, and on April 25, 2014 the Cover Oregon board unanimously voted to transition to the federal health insurance exchange. *Id.* at ¶¶ 11, 153. The plaintiffs allege the State and Cover Oregon are unable to use "the vast majority of [Oracle's] shoddy and incomplete work." *Id.* at ¶¶ 11, 154.

The plaintiffs assert fourteen claims for relief based on the following causes of action: (1) fraud; (2) violation of Oregon False Claims Act ("FCA"); (3) breach of contract, sub-limited to claims for: (a) breach of express contract, (b) breach of warranty of repair, (c) breach of warranty to recover fees, (d) breach of implied duty of good faith and fair dealing, (e) promissory estoppel; and (4) violation of Oregon RICO.

The plaintiffs seek: (1) $409,596,265 in damages; (2) statutory penalties of $1,000 for each FCA violation and $250,000 for each RICO violation; (3) injunctive relief; (4) voiding of the contracts; (5) prejudgment interest at the statutory rate of 9%; and (6) attorneys' fees and costs.

## COVERAGE DISCUSSION

As explained below, Beazley concludes that a significant portion of the claims asserted in the complaint do not fall within the scope of coverage under the Policy.

### A. Insuring Clause B. Technology Products Coverage

Insuring Clause B provides coverage for:

> **Damages** and **Claims Expenses,** in excess of the Deductible, which the **Insured** shall become legally obligated to pay because of any **Claim** first made



against any **Insured** and reported to the Underwriters during the **Policy Period or Optional Extension Period** (if applicable) arising out of:

1. any negligent act, error or omission, or any unintentional breach of contract, by the Insured on or after the Retroactive Date set forth in Item 6. of the Declarations and before the end of the **Policy Period** that results in the failure of **Technology Products** to perform the function or serve the purpose intended;

**"Technology Products"** is defined in Section VI.AA of the Policy as:

computer or telecommunications hardware or software product, or related electronic product that is created, manufactured or developed by the **Insured Organization** for others, or distributed, licensed, leased or sold by the **Insured Organization** to others for compensation (or for free if provided in conjunction with other fee based services or products provided for compensation or to potential or existing customers as an encouragement to purchase such products) including software updates, service packs and other maintenance releases and training provided for such products.

According to the information provided, Oracle was contracted to provide the "Oracle Solution" to build the State's health insurance exchange and to modernize its aging social services computer systems, based on Oracle's Siebel and OPA software programs. Compl. ¶¶ 35, 51-52. The plaintiffs allege that they believed Oracle's software programs would work "out-of-the-box" with only 5% of the business requirements requiring customization. *Id.* at ¶ 3. The "Oracle Solution" was, in part, a "computer ... software product ... created, manufactured or developed by the **Insured Organization** for others ... for compensation," and therefore was a **"Technology Product"**

The plaintiffs allege Oracle breached its contracts by failing to deliver on its obligations. *Id.* at ¶ 1. Accordingly, to the extent the allegations constitute a "negligent act, error or omission, or any unintentional breach of contract" that results in the "failure of **Technology Products** to perform the function or serve the purpose intended," the lawsuit falls within the scope of coverage set forth under Insuring Clause B.

However, Beazley notes that neither the plaintiff's FCA claims nor the RICO claims fall within the scope of the Insuring Clauses, as liability for these claims is not premised upon "negligent" acts and "unintentional" breaches of contract.

As Beazley has concluded that this matter potentially falls within the scope of Insuring Clause B, Beazley has not included a discussion of other potentially applicable Insuring Clauses and Beazley reserves all rights in relation to these other Insuring Clauses.


### B. Exclusion N (RICO) Bars Coverage for Counts Thirteen and Fourteen

Exclusion N precludes coverage for any claim:

> For or arising out of the actual or alleged violation of the Organized Crime Control Act of 1970 (commonly known as Racketeer Influenced And Corrupt Organizations Act or RICO), as amended, or any regulation promulgated thereunder or any similar federal law or legislation, or law or legislation of any state, province or other jurisdiction similar to the foregoing, whether such law is statutory, regulatory or common law; however, this exclusion does not apply to any otherwise covered **Claim** under Insuring Clauses C.1.(b ), C.2.(a), or C.2.(b), or to paying **Privacy Notification Costs** under Insuring Clause C.3., that results from a theft, loss or **Unauthorized Disclosure** of **Personally Identifiable Non-Public Information,** provided that none of the **Insured Organization's** Chief Executive Officer, Chief Financial Officer, General Counsel (and including any attorneys employed within the General Counsel's office) or Risk Manager participated or colluded in, or is alleged to have participated or colluded in such theft, loss or **Unauthorized Disclosure;**

The plaintiffs assert two causes of action for violation of Oregon's RICO statute. In particular, the plaintiffs allege that Oracle indirectly and directly acquired and maintained control of the health insurance exchange and modernization projects through a pattern of racketeering activity by committing or attempting to commit the crimes of unsworn falsification, fraudulently obtaining a signature, obtaining execution of documents by deception, and wire fraud. Compl. ¶¶ 342-345, 366, 375. The plaintiffs base these claims on Oracle's purported false statements and misrepresentations regarding the capabilities of the "Oracle Solution." *Id.* at ¶¶ 345, 355. Accordingly, Beazley must respectfully decline coverage for counts thirteen and fourteen of the complaint under Exclusion N.

### C. Exclusion A (Fraud); California Insurance Code § 533

Exclusion A precludes coverage for any claim:

> With respect to Insuring Clauses A., B. and D., arising out of or resulting from any criminal (except where such criminal act is based on unintentional conduct) dishonest, fraudulent or malicious act, error or omission committed by any **Insured;** however, this Policy shall apply to **Claims Expenses** incurred in defending any such **Claim** alleging the foregoing until such time as there is a final adjudication, judgment, binding arbitration decision or conviction against the **Insured,** or written admission by the **Insured,** establishing such conduct, at which time the Named Insured shall reimburse the Underwriters for all **Claims Expenses** incurred defending the **Claim** and the Underwriters shall have no further liability for **Claims Expenses;**



In addition, California Insurance Code § 533 provides that "[a]n insurer is not liable for a loss cause by the willful act of the insured; but he is exonerated by the negligence of the insured, or the insured's agents or others."

The plaintiffs assert multiple causes of action for fraud and violation of the FCA. Compl. ¶¶ 184-277. In particular, the plaintiffs allege Oracle fraudulently induced the State to enter into contracts for the purchase of hundreds of millions of dollars of products and services which failed to perform as promised. *Id.* at ¶ 1. The plaintiffs further allege Oracle presented to the State and Cover Oregon $240,280,008 in false claims under those contracts. *Id.*

Accordingly, as these allegations arise out of a "dishonest, fraudulent or malicious act," Beazley respectfully reserves all rights in relation to Exclusion A and California Insurance Code § 533, including the right to seek reimbursement for any **"Claims Expenses"** paid in connection with these claims.

### D. Exclusion F (Breach of Warranty)

Exclusion F precludes coverage for any claim:

> For or arising out of or resulting from:
>
> 1. breach of any express warranty or representation except for an agreement to perform within a reasonable standard of care or skill consistent with applicable industry standards or for breach of any implied statutory term concerning necessary quality, safety or fitness, or breach of any other contractual obligation which goes beyond an express or implied duty to exercise a degree of care or skill as is consistent with applicable industry standards;
>
> 2. breach of guarantee or any promises of cost savings, profits, or return on investment; or
>
> 3. delay in delivery or performance, or failure to deliver or perform at or within an agreed upon period of time, but this exclusion shall not preclude coverage if such delay or failure to deliver or perform is a consequence of an act error or omission committed during the course of providing **Professional Services, Technology Based Services or Technology Products** if the **Insured** has made reasonably diligent efforts to deliver or perform such **Professional Services, Technology Based Services or Technology Products;**



The plaintiffs allege that Oracle breached its warranty to re-perform deficient services. Compl. ¶¶ 1, 113, 144. In addition, the plaintiffs assert that Oracle failed to deliver a working health insurance exchange by the ACA's October 1, 2013 deadline. *Id.* at ¶ 8. Accordingly, Beazley respectfully reserves all rights under Exclusion F.

### E. Exclusion G (Advertising)

Exclusion G precludes coverage for any claim "[f]or or arising out of or resulting from: ... 3. the failure of the **Insured Organization's** goods, products, or services to conform with any represented quality or performance contained in **Advertising**." "**Advertising**" is defined in Section VI.A of the Policy as "material which promotes the product, service or business of the **Insured Organization** or others."

The plaintiffs allege that Oracle took part in a tender process to be considered a potential vendor for the health insurance exchange and modernization projects. Compl. ¶¶ 34-43. As part of that process, Oracle allegedly attended a vendor fair where Oracle gave a four-hour presentation and distributed an article describing the "Oracle Solution." *Id.* at ¶ 40. The presentation and article could be considered "material which promotes the product, service or business of the **Insured Organization**," which would fall within the Policy's definition of "**Advertising**." The plaintiffs allege that Oracle misrepresented the product to the State as the Oracle Solution was not flexible, not integrated, and did not work "out-of-the-box." *Id.* at ¶ 12. Given these allegations, Beazley respectfully reserves all rights under Exclusion G.

### F. Exclusion K (Trade Practices; Advertising)

Exclusion K precludes coverage for any claim:

> For or arising out of any actual or alleged antitrust violation, restraint of trade, unfair competition (except as covered by Insuring Clause 0.11.), violation of the Sherman Anti-Trust Act, the Clayton Act, the Robinson-Patman Act, as amended, false, deceptive or unfair trade practices, violation of consumer protection laws (except consumer privacy protection laws for **Claims** under Insuring Clause C.) or false or deceptive or misleading advertising."

The plaintiffs allege Oracle made material misrepresentations with regard to the "Oracle Solution" in addition to numerous false statements on a vendor questionnaire (Compl. ¶¶ 164-168) and that, in in reliance upon Oracle's representations, the State decided to purchase the Oracle Solution (*id.* at ¶¶ 73-78). The plaintiffs also allege that instead of hiring an independent systems integrator for the project, Oracle engaged in a "planned behind the scenes effort" to convince the State that this would just cause delay. *Id.* at ¶ 90. Oracle then allegedly convinced the State to spend millions of dollars more to use Oracle Consulting Services to design, plan and manage the project. *Id.* To the extent the allegations arise out of "false,



deceptive or unfair trade practices," or "false, deceptive or misleading advertising," Beazley respectfully reserves all rights under Exclusion K.

### G. Exclusion L (Government Entity)

Exclusion L of the Policy precludes coverage for any claim:

> Brought by or on behalf of the Federal Trade Commission, the Federal Communications Commission, or any federal, state, local or foreign governmental entity, in such entity's regulatory or official capacity; provided this exclusion shall not apply to:
>
> 1. a **Claim** by a government entity brought in its capacity as a customer of the **Insured Organization** arising in the course of the **Insured Organization's** provision of **Professional Services, Technology Based Services, Media Activities or Technology Products** to such government entity pursuant to a written agreement between such government entity and the **Insured Organization;**

As the Oregon Lawsuit action is brought by: (1) the Attorney General of Oregon on behalf of the DHS and OHA; (2) the State of Oregon; and (3) Cover Oregon, which are governmental entities in their official capacity, Beazley respectfully reserves all rights under Exclusion L. Beazley notes that the exception in subparagraph 1 of Exclusion L is limited to written agreements between the government entity asserting the claim and Oracle.

### H. Definition of "Damages"

Section VI.J of the Policy defines "**Damages**" as follows:

> "**Damages**" means a monetary judgment, award or settlement. The term **Damages** shall not include or mean:
>
> 1. future profits, restitution, disgorgement of unjust enrichment or profits by an **Insured,** or the costs of complying with orders granting injunctive or non-monetary equitable relief;
>
> 2. return or offset of fees, charges, or commissions for goods or services already provided or contracted to be provided unless otherwise agreed by Underwriters to mitigate a **Claim**;
>
> 3. costs incurred by the **Insured** to correct, re-perform or complete any **Professional Services, Media Activities or Technology Based Services**;



Deborah Miller, Esq.
Oracle Corporation
June 16, 2015
Page 9

4. taxes or loss of tax benefits, or fines, sanctions or penalties assessed against the Insured;

5. punitive or exemplary damages, or any damages which are a multiple of compensatory damages, unless insurable by law, provided that for purposes of this provision, the law most favorable to insurability of such damages shall be applied;

6. discounts, coupons, prizes, awards or other incentives offered to the **Insured's** customers or clients;

7. liquidated damages pursuant to a liquidated damages clause in a contract or agreement to the extent that such damages exceed the amount for which the **Insured** would have been liable in the absence of such contract or agreement;

8. any amounts for which the **Insured** is not liable, or for which there is no legal recourse against the **Insured;** or

9. matters deemed uninsurable under the law pursuant to which this Policy shall be construed; provided that for purposes of this provision, the law most favorable to insurability shall be applied.

Among other remedies, the plaintiffs seek injunctive relief to prevent Oracle from entering into contracts with public corporations or agencies of the State. Pursuant to subparagraph 1, injunctive relief does not fall within the definition of **"Damages."**

In addition, the plaintiffs seek statutory penalties of $1,000 for each FCA violation and $250,000 for each RICO violation. Such amounts would constitute "penalties assessed against the Insured" under subparagraph 4, and would not fall within the Policy's definition of **"Damages."**

The $240,280,008 paid to Oracle for its products and services does not constitute **"Damages"** under subparagraph 2 of the definition because this amount represents the "return or offset of fees, charges, or commissions for goods or services already provided."

Finally, the $80 million in lost revenue does not constitute **"Damages"** under subparagraph 1 to the extent this amount constitutes future profits.

Beazley respectfully reserves all rights under the entire definition of **"Damages."**

**THE POLICY DOES NOT AFFORD COVERAGE FOR ORACLE'S AFFIRMATIVE CLAIMS**

Policy Section VI.F, in pertinent part, defines **"Claim"** as:

1620929


a written demand received by any Insured for money or services including the service of suit against any Insured seeking injunctive relief (meaning a temporary restraining order or a preliminary or permanent injunction);

Section VI.G of the Policy, in pertinent part, defines "**Claims Expenses**" as:

all other fees, costs and expenses resulting from the investigation, adjustment, defense and appeal of a **Claim**, suit or proceedings arising in connection therewith, or circumstance which might lead to a Claim if incurred by the Underwriters or by the Insured in accordance with Clause II.A;

Beazley understands that Oracle filed an affirmative lawsuit against Cover Oregon, another affirmative lawsuit against former Governor Kitzhaber's 2014 reelection campaign advisers, and a counterclaim in this lawsuit asserting a cause of action for copyright infringement. As the Policy covers "**Claims**" asserted against Oracle, Oracle's prosecution of its affirmative claims against Cover Oregon and Governor Kitzhaber's former advisors are not covered under the Policy. In addition, Oracle's counterclaim for copyright infringement is not defensive to the plaintiffs' claims for fraud, false claims, racketeering, and breach of contract, as it requires different proof and would not absolve Oracle of liability. Beazley therefore respectfully advises that there is no coverage for the fees and costs incurred in connection with Oracle's affirmative lawsuits and counterclaim and requests that Oracle continue to request defense counsel segregate their fees as between the affirmative and defensive actions.

## ALLOCATION

Policy Section II. Defense, Settlement, and Investigation of Claim, paragraph A provides that it shall be the duty of the Insured to defend any claim but agrees Underwriters will advance "**Claims Expenses**" incurred before final disposition of a claim, subject to reimbursement for noncovered "**Claims Expenses**":

A. It shall be the duty of the **Insured** and not the duty of Underwriters to defend **Claims,** provided that the Underwriters shall have the right and shall be given the opportunity to effectively associate with the **Insured** in the investigation, defense and settlement of any **Claim** that appears reasonably likely to be covered in whole or in part hereunder. The Named Insured shall have the right to select defense counsel.

Subject to the payment of the Deductible as provided in Clause VIII. and allocation pursuant to Clause II.B. below, the Underwriters shall advance, on behalf of the **Insureds, Claims Expenses** which the **Insureds** have incurred prior to the final disposition of such **Claim** ...



provided that to the extent it is finally established that any such **Claims Expenses** are not covered under this Policy, the **Named Insured** shall repay such **Claims Expenses** to the Underwriters. The Underwriters shall pay **Claims Expenses** no more than once every 90 days.

Section II, subpart B contains an allocation provision, which reaffirms that the Policy does not provide coverage for any costs, expenses or losses for noncovered claims:

B. If **Damages** and/or **Claims Expenses** covered by this Policy are incurred along with costs, expenses and losses not covered by this Policy, then the **Insured** and the Underwriters agree to allocate such amount between covered **Damages** and/or **Claims Expenses** and any non-covered costs, expenses or losses based upon the relative legal exposures and the relative benefits obtained by the parties. The Underwriters shall not be liable under this Policy for the portion of such amount allocated to non-covered costs, expenses or losses.

In the event that a method of allocation cannot be agreed upon by the Underwriters and the **Insured**, then:

1. in any arbitration, suit or other proceeding, no presumption shall exist concerning what is a fair and reasonable allocation;

2. the Underwriters shall advance the amount of **Claims Expenses** which they deem fair and proper until a different amount is either negotiated by the parties, determined pursuant to the arbitration process set forth in Clause 11.B.3. below, or determined judicially; and

3. if requested by the **Insured,** the Underwriters shall submit the dispute to binding arbitration. The rules of the American Arbitration Association shall apply except with respect to the selection of the arbitration panel, which shall consist of one arbitrator selected by the **Insured,** one arbitrator selected by the Underwriters, and a third independent arbitrator selected by the other two arbitrators.

As discussed above, there is no defense or indemnity coverage for the FCA claims (counts three to nine) and Oregon RICO claims (counts thirteen to fourteen). Therefore, of the fourteen causes of action asserted against Oracle, five causes of action fall within the scope of potential coverage under the Policy: fraud (counts one to two) and breach of contract (counts ten to twelve). In addition, there is no indemnity coverage for the fraud claims (counts one to two) and limited indemnity coverage for the breach of contract claims (counts ten to twelve). Therefore, of the fourteen causes of action asserted against Oracle, the breach of contract claims (counts ten to twelve) are the sole claims that potentially fall within the scope of indemnity coverage



under the Policy. In addition, most of the claimed damages do not constitute recoverable **"Damages"** under the Policy.

After taking into account the limited covered exposure presented by this matter, pursuant to Policy Section II.B, Beazley will agree to pay 25% of reasonable fees and costs incurred to defend the claim. Oracle would be responsible for the remaining 75% of defense fees and costs. As noted above, all fees and costs associated with prosecution of Oracle's affirmative claims are not included in the allocation and Beazley requests that they continue to be billed separately.

Beazley respectfully reserves all rights in connection with the allocation of covered and noncovered fees, costs, expenses and losses.

## OTHER INSURANCE

Policy Section XIII. provides:

> This Insurance shall apply in excess of any other valid and collectible insurance available to any **Insured,** unless such other insurance is written only as specific excess insurance over the Limit of Liability of this Policy.

Beazley understands Oracle tendered this matter to its Directors & Officers insurance policy. Beazley requests confirmation that the matter has been reported to all relevant insurers, and asks Oracle to provide information regarding the insurers and any responses provided by such insurers. In the interim, Beazley reserves all rights under Policy Section XIII.

## DEFENSE COUNSEL

Policy Section II. A states:

> It shall be the duty of the **Insured** and not the duty of Underwriters to defend **Claims**, provided that the Underwriters shall have the right and shall be given the opportunity to effectively associate with the **Insured** in the investigation, defense and settlement of any **Claim** that appears reasonably likely to be covered in whole or in part hereunder. The Named Insured shall have the right to select defense counsel.

Beazley will pay reasonable and necessary defense fees and costs attributable to covered claims upon exhaustion of the Policy's $25 million retention by defense fees and costs for covered claims only. Beazley understands Oracle retained Karen G. Johnson-McKewan, Erin M. Connell, and Robert S. Shwarts of the Orrick, Herrington & Sutcliffe firm in San Francisco, California as defense counsel. Beazley further understands Oracle also engaged local counsel,

1620929



Brenna. K Legaard and Jeffery S. Eden of the Schwabe, Williamson & Wyatt firm in Portland, Oregon. Can you please provide defense counsel's hourly rates and invoices?

Beazley appreciates Oracle's quarterly updates and requests that it be advised of any significant developments as they occur.

## CONCLUSION

The positions set forth above are based upon the information available to date. Beazley continues to respectfully reserve all rights under the Policy, in equity and at law, including the right to amend these positions based on information discussed or presented at a later date.

Beazley would be pleased to consider any information Oracle believes is relevant to Beazley's analysis and which might alter the positions set forth above.

Please do not hesitate to contact me if you have any questions. We look forward to working with Oracle on this matter.

Very truly yours,

Joan N. D'Ambrosio

cc:     Bruce Cochran, Oracle (bruce.cochran@oracle.com)
        Erica Sweetman, Marsh (erica.sweetman@marsh.com)